UNITED STATES of America, Plaintiff–Appellee,

v.

Jack REIMER, a/k/a Jakob Reimer, Defendant–Appellant.

Docket No. 02–6286.

United States Court of Appeals, Second Circuit.

Argued: Aug. 6, 2003.

Decided: Jan. 27, 2004.

Ramsey Clark, (Lawrence W. Schilling, *of counsel*), New York, NY, *for Defendant–Appellant.*

Gideon A. Schor, Assistant United States Attorney, (James B. Comey, United States Attorney for the Southern District of New York, on the brief; Jeffrey Oestericher, Assistant United States Attorney, of counsel; Eli Rosenbaum, Director, and Jonathan Drimmer, Trial Attorney, for the United States Department of Justice, Office of Special Investigations, of counsel), New York, NY, *for Plaintiff–Appellee.*

Before: JACOBS and SOTOMAYOR, Circuit Judges.*

SOTOMAYOR, Circuit Judge.

The United States seeks to strip defendant-appellant Jack Reimer ("Reimer" or "defendant") of his citizenship. The government argues that Reimer's conduct during World War II should have rendered him ineligible to receive the visa upon which he entered the country in 1952, *see* Displaced Persons Act of 1948 ("DPA"), Pub.L. No. 80–774, 62 Stat. 1009 (1948), *as amended by* Pub.L. No. 81–555, 64 Stat. 219 (1950), and that his subsequent naturalization in 1959 was "illegally procured," *see* Immigration and Nationality Act ("INA"), 8 U.S.C. § 1451(a). Specifically, the government contends that, pursuant to section 13 of the DPA, Reimer

was ineligible for a visa, because during the war he assisted the Nazis in persecution, or alternatively, because he was a member or participant in a movement hostile to the United States. *See* DPA § 13, 64 Stat. at 227.

Following a bench trial, the United States District Court for the Eastern District of New York (McKenna, J.) found that the government had met its burden of proving by clear, unequivocal, and convincing evidence, *see Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), that Reimer assisted in persecution of Jews at the behest of the Nazis, and ordered Reimer's citizenship revoked. The district court, however, ruled against the government on its claim that Reimer was a part of a movement hostile to the United States.[2] Reimer appeals, arguing that his aid to the Nazis—which he maintains was largely administrative and entirely involuntary—cannot, as a matter of law, constitute assistance in persecution. The government cross-appeals, urging this Court to reverse the district court's ruling on its hostile-movement claim and find against Reimer on that basis as well. Because we affirm on the ground that Reimer assisted in persecution, we need not reach the issue raised by the government on cross-appeal.

## BACKGROUND

In the aftermath of World War II, Congress passed the DPA in an effort to permit at least some of the hundreds of thousands of people displaced by the war to

* The Honorable Fred I. Parker, who was a member of the panel, died following argument, and the appeal is being decided by the remaining two members of the panel, who are in agreement. *See* 2d Cir. R. § 0.14(b).

2. The district court also ruled against the government on its claim, brought under section 10 of the DPA, that Reimer's citizenship

should be revoked because he "willfully ma[de] a misrepresentation for the purpose of gaining admission into the United States as an eligible Displaced Person." DPA § 10, 62 Stat. at 1013. We need not address the claim, as the government has not challenged that aspect of the decision on cross-appeal.

seek refuge in the United States, without regard to previous immigration quotas. *Fedorenko*, 449 U.S. at 495, 101 S.Ct. 737; *United States v. Sokolov*, 814 F.2d 864, 868–69 (2d Cir.1987). At the same time, however, Congress unequivocally provided that not all displaced persons were eligible for visas. Among those barred from eligibility by section 13 of the DPA, as amended in 1950, was

> any person who is or has been a member of or participated in any movement which is or has been hostile to the United States or the form of government of the United States, or ... any person who advocated or assisted in the persecution of any person because of race, religion, or national origin, or ... any person who has voluntarily borne arms against the United States during World War II.

DPA § 13, 64 Stat. at 227.

Among the throngs of refugees and survivors of the death and work camps who entered the United States on visas issued under the DPA, was Jack Reimer.

Although Reimer is of German descent, he was born in 1918 in the Ukraine and grew up in the Soviet Union.[3] Prior to the war, Reimer studied at a state school to become a librarian. He spoke both German and Russian. In January 1940, Reimer was drafted into the Russian army. When the Germans invaded the Soviet Union on June 22, 1941, Reimer was deployed into combat. He was captured not long after and held by the Germans as a prisoner-of-war. After two months in a camp at Biala–Podlaska, Poland, Reimer was transferred to the infamous training camp at Trawnicki.

The purpose of the camp at Trawnicki was to train guards, who were then placed under the control of the German Schutzstaffel ("SS"). Although the guards provided a variety of logistical support to the German army, they played a key role in furthering the Nazis' plan—dubbed "Operation Reinhard"—to exterminate Poland's Jews. Thus, for example, the guards—who were collectively referred to as "Wachmannschaften" or "Trawnicki men"—policed concentration camps and cleared Poland's Jewish ghettos. The Wachmannschaften, including Reimer, typically were uniformed, paid, given leave, occasionally armed, and given the possibility of promotion.

Reimer's exact role in the Wachmannschaften was very much disputed at trial. Reimer conceded in his testimony that he not only received guard training but also assisted in the training of other Trawnicki men. He was promoted four times, and awarded a medal for outstanding service to the German forces by a non-German. Reimer maintained, however, that his responsibilities were largely administrative and confined to accounting, translating, and keeping track of supplies.

The government asserted that Reimer was in the thick of the Wachmannschaften's operations. For example, the government presented evidence that placed Reimer in Lublin, Czestochowa, and Warsaw when those cities' Jewish ghettoes were cleared, and tens of thousands of Jews were forced into concentration and labor camps. The government's expert

---

**3.** These facts are taken from the thorough opinion of the district court. *See United States v. Reimer,* 2002 U.S. Dist. LEXIS 26356, at *9–*21, 2002 WL 32101927 (S.D.N.Y. Sept. 3, 2002). Much of the history that informed the district court's opinion was taken from the report of the government's expert witness, which was admitted into evidence and contained facts not disputed by defendant. *Id.* at *10 n. 2, 2002 WL 32101927.

witness testified that these Wachmanns-chaften operations were customarily manned with no more guards than were absolutely necessary to effectuate the mission's objective of forcibly deporting the ghetto residents to concentration camps. The government argued that this gave rise to an inference that Reimer's role in these events could not merely have been limited to administrative support.

The district court largely refused to draw such inferences, instead confining much of its factual findings to the version of events to which Reimer testified at trial.[4] The district court, however, found that even these facts were sufficient to support the conclusion that Reimer assisted the Nazis in persecution. Reimer testified to providing logistical support to other Wachmannschaften during the ghetto clearings at Czestochowa and Warsaw, standing guard while armed outside empty buildings in Lublin after the buildings had been cleared of Jewish inhabitants, and being present when civilians were thrown into a pit and murdered. Reimer was armed at the pit killing, and he admitted to having fired on command when one of those in the pit was observed to be still alive, although the district court credited Reimer's account that he fired over the victim's head. Reimer also testified to witnessing the SS carry out mass killings of Jews.

Near the end of the war, when the German army was in retreat, the Trawnicki men, including Reimer, were consolidated into the "SS Battalion Streibel." Around that time, Reimer applied for and was given German citizenship. Although the

record is sparse as to Reimer's precise conduct during the final months of the war, we know he entered Germany around the same time that the war was declared over. Seven years later, in 1952, Reimer applied for and was granted a visa pursuant to the DPA. He acquired United States citizenship in 1959.

## DISCUSSION

Of the questions presented to us, we answer only whether Reimer can, as a matter of law, be said to have "assisted in the persecution of any person because of race, religion, or national origin." DPA § 13, 64 Stat. at 227. Reimer argues that his conduct cannot amount to assistance in persecution because his service in the Wachmannschaften was involuntary; his duties were largely administrative; he engaged in no personal act of persecution; and he did not know that those murdered in his presence were persecuted because of their race, religion, or national origin. To find in Reimer's favor, however, we would need to close our eyes to the facts as found by the district court, and overlook that many of these same defenses have been rejected by prior decisions of this Court and the Supreme Court. We will do neither.

The leading case on the interpretation of the DPA is *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), in which the Supreme Court affirmed the decision of the Fifth Circuit ordering the denaturalization of Feodor Fedorenko on the ground that he had made material misrepresentations to authorities in obtaining his visa.[5] *Id.* at 513,

---

4. We are more than satisfied that the district court held the government to a sufficiently high burden to satisfy the "clear, unequivocal, and convincing" standard of review the Supreme Court has held applicable in cases seeking revocation of citizenship. *Fedorenko,*

449 U.S. at 505, 101 S.Ct. 737. Moreover, Reimer does not challenge the district court's factual findings.

5. Although the government's claim against Fedorenko was somewhat different than the

101 S.Ct. 737. Fedorenko was drafted into the Russian army, captured and sent to a series of prisoner-of-war camps, and then selected to go through military training at the camp in Trawnicki, Poland. *Id.* at 494, 101 S.Ct. 737. Thereafter, Fedorenko spent much of the remainder of the war as an armed guard at concentration and labor camps. *Id.* Although Fedorenko admitted in his testimony at trial that he once "followed orders and shot in the general direction of" prisoners fleeing a concentration camp, Fedorenko maintained that he usually just stood watch as a perimeter guard and that he was compelled to provide such service against his will. *Id.* at 500, 101 S.Ct. 737.

The Supreme Court, however, found that Fedorenko's conduct during the war would have rendered him ineligible to receive a visa, because the DPA "made *all* those who assisted in the persecution of civilians ineligible for visas." *Id.* at 512, 101 S.Ct. 737. Further, in explaining its conclusion that Fedorenko's conduct constituted assistance in persecution, the Court stated the following:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a

pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.

*Id.* at 512 n. 34, 101 S.Ct. 737. Thus, although the Court acknowledged that "[o]ther cases may present more difficult line-drawing problems," Fedorenko's conduct provides lower courts with a clear example of assistance in persecution. *Id.*

As an initial matter, Reimer argues that it would be unjust to consider his wartime conduct "assistance" in persecution, contending that he was obliged either to go along with the commands of his superiors, or to face death himself. This argument, however, is plainly foreclosed by *Fedorenko.* There, the Supreme Court rejected the argument that those forced into the Nazis' service should not be held responsible for their conduct, reasoning that, if Congress had intended for visas to be withheld from only those who voluntarily assisted in persecution, it would have so stated in the DPA. *Id.* (noting Congress's deliberate use of the word "voluntary" elsewhere in the statute). Following *Fedorenko,* the voluntariness of Reimer's conduct is therefore not determinative of whether he assisted in persecution.

---

claim asserted against Reimer in this appeal, *Fedorenko* is nevertheless the appropriate starting point for our analysis. The claim asserted against Fedorenko was that he unlawfully made material misrepresentations in procuring his visa and naturalization. *Fedorenko,* 449 U.S. at 507–08, 101 S.Ct. 737. In reaching the conclusion that Fedorenko's misstatements were "material," the Supreme Court reasoned that a material misstatement is one that altered facts that, had they been known to the visa-issuing officer at the time, would have precluded the issuance of the visa. *Id.* at 509, 101 S.Ct. 737. Fedorenko's

misstatements were material because they concealed his actual conduct during the war. That conduct, the Supreme Court held, constituted assistance in persecution under the DPA for which Fedorenko's visa would have been denied. *Id.* at 512–13, 101 S.Ct. 737. Further, the "assisted in persecution" language interpreted by the Supreme Court in *Fedorenko* was later incorporated into section 13 of the DPA, pursuant to which the claim now before us is brought. *See Petkiewytsch v. INS,* 945 F.2d 871, 876 (6th Cir.1991) (discussing 1950 amendments to section 13).

Rather, our task is to decide where Reimer's conduct falls "between the extremes of the death camp barber and the weapon wielding guard." *United States v. Sprogis*, 763 F.2d 115, 121 (2d Cir.1985). As the similarities between Reimer and Fedorenko are readily apparent, even at first glance, we find this task not particularly difficult. Both Reimer and Fedorenko began the war as draftees into the Russian army. Both were captured by the Germans and kept as prisoners of war. Both were sent to Trawnicki where they were put through compulsory guard training. Both were thereafter uniformed, paid, and occasionally given leave.

Reimer contends, however, that the similarities end there. Reimer argues that while Fedorenko went on to serve as an armed guard at camps in which the prisoners were systematically worked or put to death, he was relegated to the role of a low-level bureaucrat, merely doling out pay and supplies to other guards. The facts, and indeed much of Reimer's own testimony at trial, belie this purported passivity.

Reimer not only went through military training at Trawnicki but also then trained other Wachmannschaften. He was, moreover, dispatched from Trawnicki on a number of missions, and was present in Lublin, Czestochowa, and Warsaw when the Wachmannschaften forcibly cleared those cities' Jewish ghettos. Although the district court found that Reimer's responsibilities in both Czestochowa and Warsaw were confined to feeding and paying those Wachmannschaften more directly responsible for clearing the ghettos, Reimer was armed in Lublin and stood guard outside expropriated Jewish property.

Perhaps most damning to Reimer's argument, however, is that on at least one occasion he stood, armed, at the edge of a pit into which people—some alive and others dead—had been thrown. When one of the men who lay in the pit moved slightly, Reimer was ordered to fire. He did. The man in the pit was killed. Reimer maintains that the fatal bullet did not come from his gun, but from that of one of the other armed guards who fired from the pit's edge. He testified that he deliberately fired over, and not into, the pit. Even crediting such a self-serving assertion, as the district court did, we do not think that whether Reimer assisted in persecution turns on such a distinction. We find it no less an act of assistance in persecution that Reimer, whose presence just as much as that of the other armed guards forced the victim to remain in the pit waiting to be murdered, ultimately fired over the victim's head.[6]

We also reject Reimer's argument, relying on this Court's decision in *Sprogis*, that his conduct does not constitute assistance in persecution because he did not "personally carry[ ] out Nazi-ordered oppression." *Sprogis*, 763 F.2d at 122. In *Sprogis*, we held that the government had not met its high burden of proving that the defendant had assisted in persecution, where the evidence suggested that Elmars Sprogis "only . . . passively accommodated

---

6. It is noteworthy that the Supreme Court concluded that Fedorenko had assisted in persecution, even absent a finding that Fedorenko made contact with any of the escaping prisoners upon whom he fired. Although the Supreme Court characterized Fedorenko as having shot "*at* escaping inmates," *Fedorenko*, 449 U.S. at 512 n. 34, 101 S.Ct. 737 (emphasis added), the Court elsewhere noted that Fedorenko testified to only having "shot *in the general direction of*" those who fled. *Id.* at 500, 101 S.Ct. 737 (emphasis added). Indeed, the district court in that case found that it "doubt[ed] that [Fedorenko] did anything other than shoot over [the inmates'] heads." *United States v. Fedorenko*, 455 F.Supp. 893, 914 (S.D.Fla.1978).

the Nazis, while performing occasional ministerial tasks" which his position as a Latvian police officer required. *Id.* at 122–23. Reimer would have us read our decision in *Sprogis* to require proof that the defendant engaged in a "personal act" of persecution in every case. But even assuming that is the proper reading of *Sprogis*, we find that Reimer clearly engaged in a sufficiently personal act of persecution to distinguish this case from *Sprogis*.[7]

Lastly, although Reimer's papers on appeal fail to make the point, Reimer argued below and at oral argument that he was unaware that the man in the pit who was killed in his presence was being persecuted *"because of* race, religion, or national origin." DPA § 13, 64 Stat. at 227 (emphasis added). We conclude, however, that following our decision in *Maikovskis*, the government did not need to prove that Reimer "identified himself with the Nazis' basis for persecution." *Maikovskis*, 773 F.2d at 445 (interpreting language of deportation statute, 8 U.S.C. § 1251(a)(19), which is similar to that of the DPA). It is

enough that the government showed by clear, unequivocal, and convincing evidence that Reimer, on orders from the Nazis, assisted in conduct that fits our conception of persecution. *See Fedorenko*, 449 U.S. at 512 n. 34, 101 S.Ct. 737 (instructing courts to "focus[ ] on whether particular conduct can be considered assisting in the *persecution* of civilians") (emphasis in original); *Sokolov*, 814 F.2d at 874 ("Webster's Dictionary defines 'persecution' as 'the infliction of sufferings, harm, or death on those who differ . . . in a way regarded as offensive or meriting extirpation,' and as 'a campaign having for its object the subjugation or extirpation of the adherents of a religion.'").

We hold that the government has met its burden, and has shown that Reimer was not in possession of a valid visa when admitted for permanent residence. *See* 8 U.S.C. § 1427(a)(1). Because we find Reimer "failed to comply with . . . 'the congressionally imposed prerequisites to the acquisition of citizenship,'" *Sokolov*, 814 F.2d at 873 (quoting *Sprogis*, 763 F.2d at 117 n. 2), Reimer's citizenship was prop-

---

**7.** We note that in a case decided after *Sprogis*, we found that a defendant who merely authored anti-Semitic articles for Nazi propaganda illegally procured his visa under the DPA, even though "there was no showing of actual persecution of Jews." *United States v. Sokolov*, 814 F.2d 864, 874 (2d Cir.1987) (noting that DPA disqualified from visa-eligibility those who assisted or advocated persecution); *see also Maikovskis v. INS*, 773 F.2d 435, 446 (2d Cir.1985) (finding assistance in persecution without explicit reference to a personal act of persecution); *cf. Ofosu v. McElroy*, 98 F.3d 694, 701 (2d Cir.1996) (interpreting asylum statute in light of judicial constructions of "other immigration legislation," for which "personal involvement in killing or torture is not necessary to impose responsibility for assisting or participating in persecution"). *But cf. Petkiewytsch v. INS*, 945 F.2d 871, 879–80 (6th Cir.1991) (holding under deportation statute modeled on the DPA, *see* 8 U.S.C. § 1251(a)(19), that proof of personal active

assistance or participation in persecutorial acts is required); *Laipenieks v. INS*, 750 F.2d 1427, 1434–35 (9th Cir.1985) (same) (cited in *Sprogis*, 763 F.2d at 122).

Nor, in light of our finding that Reimer personally participated in persecution, do we need to address Reimer's attempts to distinguish this case from those in which courts have found that a defendant's service as an armed guard obviates the need to show the defendant's personal participation in persecution. *See United States v. Szehinskyj*, 277 F.3d 331, 339 (3d Cir.2002) (holding that where defendant is an armed guard "personal participation in atrocities is not required for one to have assisted in persecution"); *United States v. Kairys*, 782 F.2d 1374, 1378 (7th Cir.1986) (same). We do, however, think Reimer is hard pressed to explain what he was doing when he stood outside the Jewish property in Lublin, or at the edge of the pit, carrying a firearm, if not serving as an armed guard.

erly revoked by order of the district court. Although the record does not suggest other than that Reimer has lived a long and law-abiding life as a U.S. citizen, Reimer's arguments in this regard fail, as courts are without equitable power to "excuse illegal or fraudulent procurement of citizenship." *Fedorenko,* 449 U.S. at 517, 101 S.Ct. 737.

Because we affirm the decision below on the ground that Reimer assisted in persecution, we need not consider whether the district court was right to conclude that Reimer's membership and participation in the Wachmannschaften, and later in the SS Battalion Streibel, did not make him a "person who is or has been a member of or participated in a movement which is or has been hostile the United States."[8] DPA § 13, 64 Stat. at 227.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court ordering the revocation of defendant's citizenship, setting aside the April 28, 1959 order admitting defendant to citizenship, and cancelling defendant's certificate of naturalization.

---

**8.** We, however, do note that the only decision upon which the district court relied in reaching its conclusion was withdrawn and revised subsequent to entry of the district court's judgment in this case. *See United States v. Kwoczak,* 210 F.Supp.2d 638 (E.D.Pa.2002), *amended by* 2002 Dist. LEXIS 22271, 2002 WL 32137688 (E.D.Pa.2002). Rather than holding that belonging to the Wachmannschaften or Battalion Streibel does not constitute membership in a movement hostile to the United States, that decision now holds the opposite. *See Kwoczak,* 2002 Dist. LEXIS 22271, at *9, 2002 WL 32137688, at *1. We express no opinion on this issue.