**Zhang Jian XIE, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Docket No. 03–4196.**

United States Court of Appeals, Second Circuit.

Argued: May 11, 2005.

Decided: Jan. 5, 2006.

*see id.* §§ 204, 207.

Donald L. Schlemmer, Washington D.C., for Petitioner.

Michael C. Johnson, Assistant United States Attorney for the District of Colorado (William J. Leone, Acting United States Attorney for the District of Colorado, of counsel), Denver CO, for Respondent.

SACK, Circuit Judge.

Petitioner Zhang Jian Xie, a citizen of the People's Republic of China, entered the United States unlawfully in October 1992. In October 1993, Xie applied to the Immigration and Naturalization Service of the Department of Justice for asylum and withholding of removal.

Before coming to this country, Xie had worked for more than a year as a driver for the Changle County Department of Health in Fujian Province, China. One of his occasional duties was to transport pregnant women to hospitals where forced abortions were performed on them in furtherance of China's family planning policies. On several such trips, an unarmed guard accompanied them. But on what turned out to be the last, Xie transported a woman without a guard present. In response to her plea, Xie released her. He was terminated from his employment as a result.

In his application for asylum, Xie argued that he feared persecution if he returned to China because his wife, whom he married in the United States, was expecting a child, and the couple hoped to have more children. In denying Xie's application, the Immigration Judge ("IJ") concluded that although Xie might otherwise have been eligible for asylum based on his fear of future persecution in accordance with China's family planning policies, his actions as a driver for the Department of Health constituted "assistance in persecution," rendering him ineligible for a grant of asylum and for withholding of removal. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision without opinion. Xie now petitions this Court for review.

**BACKGROUND**

The following facts are undisputed. Xie, a citizen of the People's Republic of China, was born in 1971 in Changle County, Fujian Province, China. He finished the Chinese equivalent of high school at the age of eighteen. A year later, he took a job as a driver for the Changle County Department of Health, where he worked from sometime in 1990 to May 1992. It appears that, save for any financial repercussions, Xie was free to leave the job at any time.[1]

---

1. According to the transcript of Xie's hearing before the IJ:

Although much of Xie's duties entailed the performance of such mundane tasks as driving officials to villages to inspect restaurants and stores, occasionally he transported pregnant women to hospitals in the locked back of a van, against their will, so that county officials could perform forced abortions on them pursuant to China's mandatory family planning policies. Xie testified before the IJ that he performed this function as few as three and as many as five times during his tenure at the Department of Health. On each occasion, he says, the woman he transported physically resisted and wept. And on each of those trips except the last, the woman was accompanied by an unarmed guard. On that final trip, however, when no guard was present, Xie released the woman in response to her cries. For that, he was terminated from his employment.

In October 1992, Xie entered the United States illegally. One year later, he filed an application for asylum under 8 U.S.C. § 1158 and statutory withholding of removal under 8 U.S.C. § 1231. He asserted that he was seeking asylum because he was subject to persecution in China for his role in the student movement.

In April 1997, the government began removal proceedings. On October 7 of that year, a preliminary removal hearing was held before an IJ. At the hearing, Xie conceded his removability but made clear his reliance on his October 1993 asylum application. The IJ eventually scheduled an evidentiary hearing for December 2, 1998 to rule on the application.

Q. Did you ever think about refusing to be a driver?
A. Yes.
Q. Did you voice that thought to any of your supervisors?
A. Oh I did tell my mother.
. . . .

On December 1, 1998, Xie prepared and executed an affidavit, which he attached as an addendum to his previous asylum application. Xie Aff., Dec. 1, 1998. According to the affidavit, on April 15, 1998, while in the United States, Xie married Lu Biqin, who had "also escaped from China without permission and entered the United States illegally." *Id.* ¶ 3. Xie asserted that he feared persecution if they were to return to China, because of China's family planning policy. He also stated that his wife was pregnant with the couple's first child and that he and his wife planned to have two or three children eventually. He asked that the IJ "consider [his] claim in light of [his] new situation." *Id.* ¶ 1.

On July 22, 1999, the IJ held a hearing on the merits of Xie's application. In his oral decision denying the application, the IJ noted that the government had stipulated that Xie "might very well be eligible for asylum" as a result of his "well-founded fear" of being persecuted by China's family planning policies. *In re Zhang Jian Xie,* No. A 73 185 935 (DOJ Immig. Ct. July 22, 1999), Oral Dec. Tr. at 2. But the IJ found that, by assisting in the transportation of women to hospitals where they underwent forced abortions, Xie "had a hand in implementing the policy which we now define as persecution." *Id.* at 5. He concluded that Xie could therefore not be deemed a refugee within the meaning of 8 U.S.C. § 1101(a)(42) and was consequently not eligible for asylum. The IJ denied Xie's application for withholding of removal on the same grounds.

Q. You undertook a task that you didn't like. Did you do it because you needed the money?
A. Yes.
*In re Zhang Jian Xie,* No. A 73 185 935 (DOJ Immig. Ct. July 22, 1999), Tr. at 46.

Xie appealed to the BIA, which summarily affirmed the IJ's decision. This petition followed.

## DISCUSSION

### I. Standard of Review

■ "It is well-settled that when the BIA summarily affirms an IJ's decision, we review the decision of the IJ directly." *Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 189 (2d Cir.2005).

> In reviewing asylum determinations, we defer to the factual findings of . . . the IJ if they are supported by substantial evidence. Under this standard, we will not disturb a factual finding if it is supported by reasonable, substantial, and probative evidence in the record when considered as a whole. Indeed, we must uphold an administrative finding of fact unless we conclude that a reasonable adjudicator would be compelled to conclude to the contrary.

*Zhou Yun Zhang v. INS*, 386 F.3d 66, 73 (2d Cir.2004) (internal quotation marks, citations and footnote omitted); *see also* 8 U.S.C. § 1252(b)(4)(B) (stating that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). We review the IJ's conclusions of law *de novo*. *Guan Shan Liao v. U.S. Dep't of Justice*, 293 F.3d 61, 66 (2d Cir.2002).

The petitioner bears the burden of proving that he or she meets the requirements of refugee status under 8 U.S.C. § 1101(a)(42). "If the evidence indicates that [the asylum applicant was a persecutor], he or she shall have the burden of proving by a preponderance of the evi-

dence that he or she did not so act."[2] 8 C.F.R. § 208.13(c).

### II. Asylum

Under section 208(b) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b)(1)(A), an alien may be granted asylum if the Attorney General determines that he or she is a "refugee." The term "refugee" is defined by the INA as an individual who is persecuted or who has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Under the INA, compulsory population control measures, such as forced abortions, constitute persecution.

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

*Id.* The BIA has interpreted this provision to apply to the husband of a woman who has experienced this form of persecution. *See In re C–Y–Z–*, 21 I. & N. Dec. 915, 918 (B.I.A.1997) ("The position of the Immigration and Naturalization Service is that past persecution of one spouse can be es-

---

**2.** As the basis for his argument that the government bears the burden of proof to show that he was a persecutor, Xie cites *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). *Fedorenko* deals with judicial revocation of citizenship proceedings. That case is not controlling as to the burden of proof for an application for asylum or withholding of removal.

tablished by coerced abortion or sterilization of the other spouse.").

8 U.S.C. § 1101(a)(42) provides, however, that the term "refugee" excludes "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* Similarly, 8 U.S.C. § 1158(b)(2)(A)(i), which otherwise gives the Attorney General discretion to grant asylum to refugees, withholds such discretion where "the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

Because the IJ concluded that, but for Xie's own acts with respect to forced abortions, he might qualify for refugee status, the principal issue before us is whether, as a matter of law, those acts amounted to "assisting in persecution," and, if so, whether, in light of his release of one woman from custody, he is nonetheless eligible for asylum.

## A. Assistance in Persecution

### 1. Fedorenko *and Voluntariness*

Xie bases his petition, as he did his application and his appeal to the BIA, in large measure on the notion that his conduct was not voluntary. Neither the relevant statutes nor the case law, however, provides support for an "involuntariness" exception to "assist[ance] in persecution."

In addressing this issue, we look principally to the Supreme Court's decision in *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). There, the Court considered what "assisted in persecution" means in the context of the Displaced Persons Act of 1948, Pub.L. No. 80–109, 62 Stat. 1009 ("DPA"). Fe-

dorenko, a Ukranian who had been drafted into the Russian Army during World War II, was subsequently captured by the German Army. He had then been forced to serve as a guard, first at the Treblinka concentration camp, and later at a German prisoner-of-war camp. On his initial application for United States citizenship, which he filed pursuant to the DPA, Fedorenko stated falsely that he had been a farmer in Poland from 1937 to 1942 and that he was deported from there to Germany, where he was forced to work in a factory until after the war. *Id.* at 496, 101 S.Ct. 737. His petition for naturalization was granted. When the government later discovered the falsehoods, it filed an action pursuant to 8 U.S.C. § 1451(a) to revoke his citizenship for having secured it through "willful misrepresentation." *Fedorenko*, 449 U.S. at 497–98, 101 S.Ct. 737.

In contesting the revocation of his citizenship on the ground that his acts of persecution had been involuntary, Fedorenko insisted that "he had merely been a perimeter guard." *Id.* at 500, 101 S.Ct. 737. He admitted, however, that he "had followed orders and shot in the general direction of escaping inmates." *Id.* He further conceded that "the Russian armed guards significantly outnumbered the German soldiers at the camp, that he was paid a stipend and received a good service stripe from the Germans, and that he was allowed to leave the camp regularly but never tried to escape." *Id.* (footnote omitted).

The *Fedorenko* Court observed that the DPA defines "displaced person" as anyone who meets the definition of "displaced person or refugee" in the Constitution of the International Refugee Organization of the United Nations (the "IRO Constitution"). *See id.* at 495, 101 S.Ct. 737 (citing DPA § 2(b), 62 Stat. at 1009).[3] Because the

---

**3.** Section 2(b) of the DPA reads: " 'Displaced     Person' means any displaced person or refu-

IRO Constitution exempts from its definition of refugee anyone who "assisted the enemy in persecuting civil populations," *id.* (citing IRO Constitution, Annex I, Part II, § 2(a), Dec. 14, 1946, 62 Stat. 3037, 3051–52, 18 U.N.T.S. 3, 20), such persons are also ineligible for refugee status under the DPA.

The Court then concluded that it was "unable to find any basis for an 'involuntary assistance' exception in the language" of the IRO Constitution. *Id.* at 512, 101 S.Ct. 737. It noted that section 2(b) of the IRO Constitution specifically exempted from refugee status those who "assisted the enemy in persecuting [civilians]" as well as those who had *"voluntarily* assisted the enemy forces." *Id.* at 495, 101 S.Ct. 737 (citing IRO Constitution, Annex I, Part II, § 2(a) & (b), 62 Stat. at 3051–52, 18 U.N.T.S. at 20)(emphasis added). "Under traditional principles of statutory construction," the Court reasoned, "the deliberate omission of the word 'voluntary' from § 2(a)" of the IRO Constitution "compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas." *Id.* at 512, 101 S.Ct. 737 (emphasis in original).

The relevant provisions of the INA are markedly similar to those that the DPA incorporated from the IRO Constitution. The INA excludes from the definition of "refugee" any person who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42), while the DPA, incorporating by reference portions of the IRO Constitution, excludes from

eligibility persons who "assisted the enemy in persecuting [civilians]." IRO Constitution, Annex I, Part II, § 2(a), 62 Stat. at 3051–52, 18 U.N.T.S. at 20, incorporated by reference in DPA §§ 2(b) & (c), 62 Stat. at 1009–10.

It is true that unlike the IRO Constitution, the INA does not contain a contrasting section that covers only "voluntary" conduct. But inasmuch as the INA and the DPA were enacted for similar purposes— to enable refugees to find sanctuary in the United States in the wake of World War II—we find it unlikely that the phrase "assisted in persecution" implicitly includes a voluntariness requirement in one statute but not the other. *See Fedorenko,* 449 U.S. at 495, 101 S.Ct. 737; *cf. Monter v. Gonzales,* 430 F.3d 546, 555–56 (2d Cir. 2005) (concluding that the word "procure" has the same meaning in administrative removal proceedings as it does in judicial denaturalization proceedings).

Having rejected "involuntariness" as a defense, the *Fedorenko* Court decided that Fedorenko's behavior did indeed constitute assistance in persecution. The Court observed:

[A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory

gee as defined in Annex I of the Constitution of the International Refugee Organization and who is the concern of the International Refugee Organization." DPA § 2(b), 62 Stat. at 1009. Sections 2(c), (d) and (e) of the Act set

forth the qualifications necessary for a person to be an "eligible displaced person" with respect to obtaining United States immigrant visas.

language about persons who assisted in the persecution of civilians. *Fedorenko,* 449 U.S. at 512 n. 34, 101 S.Ct. 737. We have employed that dictum as a guide in subsequent cases.

### 2. Fedorenko's *Progeny*

In *Maikovskis v. INS,* 773 F.2d 435 (2d Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986), we upheld the BIA's order of deportation under the INA of a former Latvian police chief who had ordered arrests under instructions from the Nazis. "As with the case of the concentration camp guard in *Fedorenko,*" we concluded, "there is little difficulty in determining that a police chief who, on orders from the Nazis, ordered his men to arrest all of the inhabitants of a village and burn the village to the ground has assisted in persecution." *Id.* at 446. As in *Fedorenko,* we deemed irrelevant Maikovskis's personal motivation or intent in carrying out his orders. *Id.* at 445.

In *United States v. Sprogis,* 763 F.2d 115 (2d Cir.1985), by contrast, we looked to *Fedorenko* in concluding that a former Latvian police officer was *not* rendered ineligible for an immigrant visa under the INA for having performed various ministerial tasks for the Nazis when they occupied Latvia. Citing the dicta in *Fedorenko,* we recognized that the conduct in question "obviously [fell] between the extremes of the death camp barber and the weapon wielding guard and presents a difficult line to draw." *Id.* at 121. But we did not look to the voluntariness of Sprogis's actions. Instead, we focused on the nature of his conduct as a whole: "Sprogis seems only to have passively accommodated the Nazis, while performing occasional ministerial tasks which his office demanded, but which by themselves cannot be considered oppressive." *Id.* at 122. Even so, in permitting his eligibility, we stressed that citizenship was a "precious right," so that the government was required to meet a high burden of proof in order to revoke it. *Id.* at 121; *see also id.* at 123 (Mansfield J., concurring) ("I concur only because the government failed to sustain its heavy burden of establishing by clear, unequivocal and convincing evidence that Sprogis *actively* assisted in persecuting Jews and other civilians." (emphasis in original)).

More recently, in *United States v. Reimer,* 356 F.3d 456, 460 (2d Cir.2004), we upheld the denaturalization under the DPA of a Ukranian former Nazi prisoner of war who had allegedly "assisted in persecution" by serving as a Nazi guard. Reimer argued that "his conduct [could] not amount to assistance in persecution because his service in the Wachmannschaften was involuntary; his duties were largely administrative; he engaged in no personal act of persecution; and he did not know that those murdered in his presence were persecuted because of their race, religion, or national origin." *Id.* at 459. "Following *Fedorenko,*" we noted that "the voluntariness of Reimer's conduct [was] not determinative of whether he assisted in persecution." *Id.* at 460. Instead, we found "most damning" the fact that "on at least one occasion [Reimer] stood, armed, at the edge of a pit into which people— some alive and others dead—had been thrown." *Id.* at 461. Although Reimer insisted that he had fired over the heads of his victims, we noted that his "presence just as much as that of the other armed guards forced the victim to remain in the pit waiting to be murdered." *Id.* Finding such conduct virtually indistinguishable from that of Fedorenko, we concluded that Reimer had "personally participated in persecution." *Id.* at 462 n. 7.

In each of these cases, in assessing the character of the individual's conduct, we looked not to the voluntariness of the person's actions, but to his behavior as a

whole. Where the conduct was active and had direct consequences for the victims, we concluded that it was "assistance in persecution." Where the conduct was tangential to the acts of oppression and passive in nature, however, we declined to hold that it amounted to such assistance.

### 3. Xie's Conduct

■ We think that the IJ was correct in deciding that Xie's actions in transporting captive women to undergo forced abortions was assistance in persecution. Unlike the defendant in *Sprogis,* Xie's actions contributed directly to the persecution. *See Sprogis,* 763 F.2d at 122 ("[I]n each … case[ ] [in which a person has been held to have assisted in persecution], the individual condemned as a persecutor had actively participated in some act of oppression directed against persecuted civilians.") By driving the van in which the women were locked, Xie ensured that they were delivered to the place of their persecution: the hospitals where their forced abortions took place. Like the defendant in *Reimer,* Xie played an active and direct, if arguably minor, role.

Even if voluntariness were relevant to the inquiry, however, nothing in the record indicates that Xie did not have the ability to quit his job as a driver at any time in order to avoid the persecution of women that was part of that job. His reason for not doing so appears to have been the loss of wages he would incur. *See supra,* note 1. Xie has never suggested that he was physically or psychologically coerced into working for the county as a driver. Nor has he demonstrated that he could not have obtained alternative employment. Thus, since it appears he could have declined at any time to participate in the persecution of the women by leaving his employment voluntarily, Xie fails to support his characterization of his assistance in persecution as involuntary.[4]

### B. Redemptive Acts

We recognize that the evidence seems to establish that when Xie had the opportunity to do so, because no guard was present in his vehicle, he heeded the plea of his captive and set her free. We do not discount the risks to him in doing so. That this act of redemption was admirable is beyond doubt or question, but beside the point. We can find nothing in the govern-

---

4. Xie does not assert that his termination for refusing to transport a woman to receive a forced abortion amounts to persecution for purposes of the INA. It may be worth noting, nonetheless, that although we have recognized that certain forms of economic deprivation may constitute "persecution" for the purposes of asylum, in order to do so the deprivation must rise to the level of "deliberate imposition of substantial economic disadvantage." *Guan Shan Liao v. U.S. Dep't of Justice,* 293 F.3d at 70 (internal quotation omitted); *cf. Yuan v. U.S. Dep't of Justice,* 416 F.3d 192, 198 (2d Cir.2005) (holding that a petitioner who had been fired as a result of his daughter-in-law's violation of China's family planning policy was not persecuted in part because "although [the petitioner] lost his job, there is no evidence that he was barred from getting another position, or even

that he looked [for one]"). Sister circuits have concluded that a government's discharge or refusal to hire may entail such an imposition, but only where the action against the petitioner consisted of something substantially more egregious than the loss of a government job. *See e.g., Borca v. INS,* 77 F.3d 210, 215–16 (7th Cir.1996) (a radiologist who was allegedly barred from assuming any government employment, except possibly as a farm laborer, could establish economic persecution); *Zhen Hua Li v. Attorney Gen. of the U.S.,* 400 F.3d 157, 169 (3d Cir.2005) (petitioner who had been "effectively blacklisted from any government employment" for having violated China's family planning policy and for whom "it would be impossible … to find another job" could establish economic persecution).

ing statutes or case law that allows such behavior, however praiseworthy, to serve as a basis for us to conclude that Xie was thereby relieved under the INA of the consequences of his having previously assisted in persecution.

To be sure, in *Ofosu v. McElroy*, 98 F.3d 694 (2d Cir.1996), we suggested that the performance of good acts or attempts to resist coercion may be relevant to an asylum determination. In ruling on whether Ofosu had a substantial possibility of success on appeal in order to determine the merits of a stay motion, we described as "debatable" the proposition, endorsed by the BIA, that "Ofosu's change of heart and redemptive conduct do not warrant consideration for asylum despite his earlier involvement in the activities of the CDR." *Id.* at 701. Our ability to infer applicable legal principles from *Ofosu* is, however, limited because in that case we were assessing Ofosu's likelihood of success on the merits, not deciding the merits themselves. And, in any event, unlike Ofosu, Xie offered no evidence that he was unaware of the repressive nature of the duties he undertook as part of his voluntary employment. Xie assisted in persecution until there were favorable circumstances for him to cease doing so. Our decision in *Ofosu* does not suggest that he is therefore eligible for refugee status and asylum.

We of course have no occasion to, and emphatically do not, conclude that redemptive behavior is necessarily irrelevant to the inquiry as to whether an applicant has assisted in persecution. We decide only that the BIA was not in error when it concluded that in these circumstances Xie's behavior, even with its redemptive aspects, amounted to "assist[ance] in persecution" under 8 U.S.C. § 1101(a)(42), and that he was therefore ineligible for asylum.

III. Withholding of Removal

■ An alien may qualify for statutory withholding of removal under 8 U.S.C. § 1231 if the Attorney General determines that the alien's "life or freedom would be threatened" based on a protected ground if he were removed to the threatening country. 8 U.S.C. § 1231(b)(3)(A). If an alien qualifies for such relief, the Attorney General must grant it. However, this provision does not apply to aliens who "ordered, incited, assisted, or otherwise participated in the persecution" of anyone on the basis of a protected ground. 8 U.S.C. § 1231(b)(3)(B)(i) (formerly codified at 8 U.S.C. § 1253(h)(2)(A)). In light of our determination that the IJ did not err in determining that Xie was not entitled to asylum because he assisted in persecution, we also conclude that he was not entitled to statutory withholding of removal.

### CONCLUSION

For the foregoing reasons, Xie's petition for review of the order of the BIA is denied.