# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 11, 2021

Lyle W. Cayce
Clerk

No. 20-40332

UNITED STATES OF AMERICA,

*Plaintiff—Appellant*,

*versus*

ARNOLDO ANTONIO VASQUEZ,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:17-CV-101

Before OWEN, *Chief Judge*, and JOLLY and DENNIS, *Circuit Judges*.

PER CURIAM:

Arnoldo Antonio Vasquez, a former Salvadorian military officer, is now a naturalized American citizen. Based on his role in extrajudicial killings and a subsequent cover-up occurring during armed conflict in El Salvador, the government seeks to revoke his citizenship, that is, to denaturalize him. The district court conducted a three-day bench trial and declined to cancel Vasquez's American citizenship. The district court erred. Although he may have refused to actually shoot civilians, we find that the former officer "assisted" and "participated in the commission of" extrajudicial killings during the Salvadorian Civil War, rendering him statutorily ineligible to

No. 20-40332

assume the "high privilege" of American citizenship.     8 U.S.C. § 1182(a)(3)(E)(iii); *Chaunt v. United States*, 364 U.S. 350, 357 (1960) (Clark, J., dissenting).  We therefore REVERSE and REMAND.

## I.

Arnoldo Antonio Vasquez served as an officer in the Salvadorian military during the brutal civil war that took place in El Salvador between 1980 and 1991.[1]  On September 20, 1988, Vasquez's superiors gave Vasquez the names and addresses of alleged members of a rebel group to capture near the town of San Sebastian.  Armed and ready, Vasquez and his soldiers traveled to the town and did as they were told.

After the alleged rebels had been captured, a major who was second-in-command of the entire battalion ordered one of the detainees to be killed.  Two of Vasquez's superiors refused to comply with the order and requested it in writing because they believed it to be illegal.  The major then skipped over these intermediate officers and contacted Vasquez directly, repeating his order and stating he would come to San Sebastian to "conduct an investigation."  Vasquez testified that at this point, he knew the major planned to kill all of the detainees and had no intention of conducting an investigation.  This understanding was further confirmed by the fact that the major had also ordered one of the detainees to be dressed in black clothing so that he would appear to be a member of a rebel group.

Knowing that the major was coming and planned to execute the detainees, Vasquez nevertheless had his soldiers dress one of the detainees in black clothes.  The major arrived, ordered the capture of additional individuals, and then ordered all of the detainees to be executed—ten

---

[1] For the most part, the facts of this case are not in dispute, and we fully rely on the district court's findings.

2

No. 20-40332

innocent civilians in total. Vasquez's soldiers proceeded to kill the detainees by staging a fake ambush: they lined up the detainees in a road, set off explosives and fired their weapons to make battle noises (and seriously wound the detainees), and then finished off the detainees at point-blank range.

Vasquez, without corroborating evidence, claims that he refused to comply with the major's order to participate in the staged ambush. But Vasquez admits that he saw his soldiers preparing for the staged ambush, knew it was happening, and was relatively close by as the detainees were murdered.

After the killings, the major instructed Vasquez to say that the detainees had been killed during a skirmish following an ambush, which was a lie. Vasquez repeated this lie to his soldiers to make sure that they knew the cover-up story. He repeated this lie again to a Salvadorian military commission charged with investigating the incident, which had come to be known as the San Sebastian Massacre. Eventually, when Vasquez found out that he was to be blamed for the massacre, he told the commission the truth.

Investigative proceedings continued for several years before the military commission and in Salvadorian courts. Vasquez was first identified as having potentially carried out the killings alongside his men but was later acquitted by a court of the crime of intentional homicide. An appellate court upheld his acquittal. During this time, however, the Salvadorian military continued to threaten and murder potential witnesses, and even judges, to prevent civilian courts from holding the military accountable. After the civil war ended, the United Nations Commission on the Truth for El Salvador specifically found that Vasquez transmitted the major's order to "designate some soldiers to finish off the victims" of the massacre. It further found that

he "provided the necessary materials to activate" the explosives that were used in the fake ambush.

Over a decade after the massacre, Vasquez applied and was approved for a visa to come to this country. Several years after that, in 2004, he sought to become a naturalized American citizen. His application was approved, and in January 2005, Vasquez took the oath of allegiance and became a United States citizen. But in 2017, the government brought this denaturalization suit against Vasquez, alleging that he failed to meet statutory requirements for citizenship at the time of his naturalization and that he procured his citizenship illegally. After a three-day bench trial, the district court found that the government had not met its burden of proof. The government appeals.

## II.

The Constitution authorizes Congress to "establish a uniform Rule of Naturalization." U.S. CONST. art. I, § 8, cl. 4. That power bestows the ability to create rules regarding both the requirements for citizenship and the potential consequences for failing to meet those requirements—even if discovered after citizenship has already been conferred. *See United States v. Mandycz*, 447 F.3d 951, 956 (6th Cir. 2006) (Sutton, J.). These consequences include denaturalization.

Congress has stated that "[n]o person" may become a citizen "unless such applicant . . . has been and still is a person of good moral character." 8 U.S.C. § 1427(a)(3). A person cannot "be regarded as, or found to be, a person of good moral character" if that person "at any time" has "committed, ordered, incited, assisted, or otherwise participated in the commission of . . . any extrajudicial killing." 8 U.S.C. § 1101(f)(9); 8 U.S.C. § 1182(a)(3)(E)(iii). Lest the meaning of "extrajudicial killing" be unclear, Congress defined the term as "a deliberated killing not authorized by a

previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992).

For over a century, the Supreme Court has recognized that "no alien has the slightest right to naturalization unless all statutory requirements are complied with." *United States v. Ginsberg*, 243 U.S. 472, 475 (1917). If a person manages to become a citizen despite not meeting Congress's requirements, his citizenship is "illegally procured." *Id.* And since "every certificate of citizenship must be treated as granted upon condition that the government may challenge it," the government may "demand [the] cancellation" of illegally procured citizenship that was not "issued in accordance with [Congress's] requirements." *Id.*

The authorization and procedures for revoking a naturalized American's citizenship who failed to comply with congressionally imposed conditions for acquiring that citizenship are found in 8 U.S.C. § 1451(a). This statute empowers the government to initiate a civil suit to "revok[e] and set[] aside" any order admitting a person as a citizen and "cancel [his] certificate of naturalization" if proven that his citizenship was "illegally procured." 8 U.S.C. § 1451(a); *Fedorenko v. United States*, 449 U.S. 490, 506 (1981). As described above, "a naturalized citizen's failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)." *Id.* at 514.

A denaturalization suit, however, is not "an ordinary civil action since it involves an important adjudication of status." *Schneiderman v. United States*, 320 U.S. 118, 160 (1943). To take away a person's American citizenship is an "extraordinarily severe" penalty: "[d]enaturalization consequences may be more grave than consequences that flow from

conviction for crimes." *Klapprott v. United States*, 335 U.S. 601, 611–12 (1949). Because "[r]ights once conferred should not be lightly revoked," the government must meet an "exacting standard" to denaturalize a citizen, proving its charges by "clear, unequivocal, and convincing evidence." *Id.* at 612; *Schneiderman*, 320 U.S. at 125. This burden is "substantially identical with that required in criminal cases" because the "objective sought" and the "gravity of the consequences" are not "so different as to justify adoption of a different standard." *Kungys v. United States*, 485 U.S. 759, 770–71 (1988); *Klapprott*, 335 U.S. at 612. The facts and the law should be construed "as far as is reasonably possible" in favor of the citizen. *Schneiderman*, 320 U.S. at 122.

## III.

We thus come to the central question: whether Vasquez, in connection with the San Sabastian Massacre, "committed, ordered, incited, assisted, or otherwise participated in the commission of" an extrajudicial killing? If the government has satisfied this standard by "clear, unequivocal, and convincing evidence," then Vasquez cannot be, as statutorily defined, a "person of good moral character" who has met congressionally prescribed requirements for citizenship. His citizenship was therefore "illegally procured" and can be revoked.

We agree with the district court that the San Sebastian Massacre constitutes an extrajudicial killing as defined in the statute. But the question we focus on is whether Vasquez "assisted" or "otherwise participated" in the massacre.

We begin, of course, with the text. Construing the facts "as far as reasonably possible" in favor of Vasquez, it does not appear that he "committed," "ordered," or "incited" the killings in San Sebastian. 8 U.S.C. § 1182(a)(3)(E)(iii). The statute, however, goes further to encompass

6

actors who "assisted" or "otherwise participated" in extrajudicial killings. *Id.* Looking to the meaning of these terms at the time of the statute's enactment, "assist" was defined "to give support or aid" or "to give usually supplementary support or aid to"; the definition of "participate" was "to take part" or "to have a part or share in something." *Assist*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2001); *Participate*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2001). These broad terms implicate a wide range of conduct beyond actually committing the crime, especially since "participate" is modified by "otherwise"—"in a different way or manner," "in different circumstances," or "in other respects." *Otherwise*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2001).

Caselaw supports this understanding. Although the Supreme Court has not yet addressed this language in the context of this statute, "laws dealing with the same subject . . . should if possible be interpreted harmoniously." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 252 (2012). In a key denaturalization case, the Court addressed the meaning of "assist[ing]" in the persecution of civilians, another statutory bar to naturalization:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.

*Fedorenko*, 449 U.S. at 514 n.33. Circuit courts have often if not uniformly turned to this descriptive language as a starting point to elucidate the term "assistance" as used in other immigration statutes: for example, when considering asylum or denaturalization for former persecutors. The "persecutor bar" to asylum prohibits those who "ordered, incited, assisted, or otherwise participated" in the persecution of others "on account of race, religion, nationality, membership in a particular social group, or political opinion" from being granted asylum. *See* 8 U.S.C. § 1158(b)(2)(A)(i); *Chen v. U.S. Atty. Gen.*, 513 F.3d 1255, 1258–59 (11th Cir. 2008) (collecting cases). Applying the language in *Fedorenko*, these courts have held that determining whether a person "assisted" or "participated" is a "particularized, fact-specific inquiry into whether the applicant's personal conduct was merely indirect, peripheral, and inconsequential association or was active, direct and integral." *Chen*, 513 F.3d at 1258–59.

Thus, in other asylum and denaturalization cases, detaining, searching, and interviewing two Jews escaping from the Nazis was deemed "assisting" in persecution, as was serving as an editor of an anti-Semitic periodical. *United States v. Dailide*, 227 F.3d 385, 392, 398 (6th Cir. 2000); *United States v. Koreh*, 59 F.3d 431, 436 (3d Cir. 1995) (denaturalization cases). Of particular similarity to the case at hand, being armed and present when civilians were thrown into a pit and murdered also was considered "assistance." *United States v. Reimer*, 356 F.3d 456, 459 (2d Cir. 2004) (Sotomayor, J.) (denaturalization case). Taking custody of and transporting innocent civilians to places where it was known they would be beaten and abused—or serving as a translator during interrogation marked by torture—also qualified as "assistance or participation in" persecution. *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 928–29 (9th Cir. 2006); *Singh v. Gonzales*, 417 F.3d 736, 740 (7th Cir. 2005) (asylum cases). In short, caselaw is uniform in its assessment that this standard "does not require actual

'trigger-pulling'"; the defendant need not engage "in the commission of physical atrocities" to be found to have "assisted" or "participated" in them. *Miranda Alvarado*, 449 F.3d at 927; *Koreh*, 59 F.3d at 442.

Here, Vasquez is more similar to *Fedorenko*'s hypothetical guard than the hypothetical barber. His undisputed conduct—capturing those who were killed, continuing to detain them knowing their deaths were imminent, waiting nearby while they were executed, and taking action to hide what truly happened—was not "merely indirect, peripheral, and inconsequential association" with the killings, but was "active, direct, and integral" to the civilians' deaths. Although, on his version of the facts, he did not engage in "trigger-pulling," he was involved enough to be considered one who assisted or otherwise participated in the killings.

Nor does Vasquez's refusal to actually pull the trigger on those murdered absolve him. In *Xie v. I.N.S.*, the Second Circuit was confronted with a similar issue in the context of the asylum persecutor bar. *Xie v. I.N.S.*, 434 F.3d 136, 138 (2d Cir. 2006) (asylum case). Before coming to America, Xie had driven captive women to forced abortions carried out by the Chinese government. *Id.* But on one occasion, because no guard was present, he released a woman who pled for her freedom. *Id.* at 143. The court held that "nothing in the governing statutes or case law" allows "redemptive behavior" to "serve as a basis for us to conclude" that the persecutor "was thereby relieved . . . of the consequences of his having previously assisted in" persecution. *Id.* at 143–44. Similarly, the fact that Vasquez refused to shoot the prisoners does not relieve him of the fact that he assisted and participated in their deaths in other ways.

Finally—and although not by any means dispositive—the statute's legislative history also provides another data point indicating a broad reading of the terms at issue. The language interpreted here was added as part of the

9

Anti-Atrocity Alien Deportation Act, which was "intended to close loopholes in U.S. immigration laws that have allowed aliens who have committed serious forms of human rights abuses abroad to enter and remain in the country"; its purpose was to "expand the grounds for inadmissibility and removability to cover aliens who have engaged abroad in acts of . . . extrajudicial killing." S. REP. NO. 108-209, at 1–2 (2003). In discussing § 1182(a)(3)(E)(iii), the legislative history makes clear that "[t]he statutory language—'committed, ordered, incited, assisted, or otherwise participated in'—is intended to reach the behavior of persons directly or personally associated with the covered acts. . . . Attempts and conspiracies to commit these crimes are encompassed in the 'otherwise participated in' language." *Id.* at 10. While the legislative history is not part of the statute and is most certainly not the law, Vasquez was "personally associated" with the murders at San Sebastian. And he was part of the conspiracy that undertook the killings and sought to cover them up.

In sum, dictionary definitions, caselaw, and legislative history point to an inescapable conclusion regarding the terms "assisted" and "participated in": they cover a broad range of conduct—including Vasquez's actions. Vasquez captured the innocent civilians who were killed. He had his men dress one of them in black to facilitate the ruse the major attempted to use to blame the killings on the rebels. He kept them detained knowing their unlawful deaths were imminent. And he thoroughly helped with the cover-up and coached others to do the same. These actions—undisputed by the parties—show that Vasquez assisted and participated in the extrajudicial killing of ten Salvadorians at San Sebastian. He therefore was not a person of good moral character, was not eligible to become a citizen, and illegally procured his citizenship. And because the government has proved this by "clear, unequivocal, convincing evidence"—again, we rely only on facts undisputed in the record—Vasquez's certificate of naturalization must be

No. 20-40332

canceled, and the order admitting him as a citizen must be revoked and set aside. The judgment is REVERSED and VACATED, and the case is REMANDED for entry of judgment consistent with this opinion.

REVERSED, VACATED, and REMANDED for entry of judgment.