Balachova v. Mukasey

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————

August Term, 2007

(Argued: April 25, 2008                    Decided: November 12, 2008)

Docket Nos. 07-2278-ag (L); 07-2279-ag (Con)

———————

EIGUENIA BALACHOVA and IGOR KRASNOPEROV,

                                                              Petitioners,

-v-

MICHAEL B. MUKASEY,[*]

                                                              Respondent.

———————

Before: McLAUGHLIN and POOLER, Circuit Judges, and COTE, District Judge.[**]

———————

　　　　Petitioners seek review of an order of the Board of Immigration Appeals affirming an immigration judge's order directing their removal to Russia and denying asylum, withholding of removal, and relief under the Convention Against Torture because, in part, she found that the male petitioner was barred from relief based on her finding that he had assisted in the persecution of others.
　　　　Petition for review DISMISSED in part and GRANTED in part; order of removal VACATED and this matter REMANDED for further proceedings.

———————

　　　　[*] Attorney General Michael B. Mukasey is substituted for his predecessor in office, former Attorney General Alberto R. Gonzales, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

　　　　[**] The Honorable Denise Cote, United States District Judge for the Southern District of New York, sitting by designation.

H. RAYMOND FASANO, Madeo & Fasano, New York, NY, <u>for Petitioner</u>.

SURELL BRADY, Office of Immigration Litigation, Civil Division, Department of Justice,
    Washington, DC (Jeffrey S. Bucholtz, Acting Assistant Attorney General, Civil Division;
    Greg D. Mack, Senior Litigation Counsel; Wendy Benner-León, Trial Attorney, on the
    brief), <u>for Respondent</u>.

————————

POOLER, <u>Circuit Judge</u>:

Petitioners Eiguenia Balachova and Igor Krasnoperov, wife and husband and natives and

citizens of Russia, seek review of an April 30, 2007, order of the Board of Immigration Appeals

("BIA") affirming the November 3, 2005, order of Immigration Judge ("IJ") Theresa Holmes-

Simmons directing petitioners' removal to Russia and denying their requests for asylum,

withholding of removal, and relief pursuant to the Convention Against Torture ("CAT"). <u>In re</u>

<u>Eiguenia Balachova</u>, No. A75 836 651 (B.I.A. April 30, 2007), <u>aff'g</u> <u>In re Eiguenia Balachova,</u>

<u>Igor Krasnoperov</u>, Nos. A75 836 651, A71 501 481 (Immig. Ct. N.Y. City, Nov. 3, 2005).[1] We

dismiss as unexhausted Balachova's claims for asylum and withholding of removal and both

parties' CAT claims, but numerous errors in assessing Krasnoperov's applications for asylum

and withholding of removal require us to vacate his removal order and remand for further

proceedings. In particular, we vacate the IJ's finding that Krasnoperov was barred from relief

because he had furthered the persecution of others. Because Balachova may be eligible for

derivative relief based on her husband's application, we vacate the order of removal with respect

to her as well.

———————————

[1] The BIA order names only Balachova as a respondent and gives only her alien number.
However, because both petitioners jointly appealed the IJ's order and the BIA simply affirmed
the "results of the decision below," we assume that the BIA rejected Krasnoperov's claims as
well.

2

**BACKGROUND**

Balachova's claim for relief from removal is based on religious persecution. She alleges that she is a Baptist and was arrested for distributing religious literature in the streets.

Krasnoperov alleges that because he is Jewish, neo-fascists beat him on two occasions and during one of these beatings threw acid on him. At his hearing, Krasnoperov also testified that while he was a student at a military academy, he was sent to help reduce ethnic tensions between two neighboring populations, Armenians and Azerbaijanis, in the southwestern portion of Russia. Although the soldiers were sent as peacekeepers, the leadership "saw and felt themselves to have been given unlimited authority [and that belief] led to thievery, even to marauding." On one particular occasion in August 1989, according to Krasnoperov, his captain ordered him and others to stop in front of a house. One of the soldiers knocked at the door to ask for permission to search for arms. No-one answered, but there was movement inside. The captain then ordered his subordinates to break down the door, and one of the soldiers kicked it open. Krasnoperov, the four other soldiers, a sergeant, and the captain entered the house, which contained an adult man and woman and two adolescent girls. The soldiers searched for arms and found nothing.

After the search was completed, the captain directed Krasnoperov to put the girls in the car. Krasnoperov went to the girls, told them that they had to come with him to the car, and reached out for the hand of one, but she pulled away and shrank back against the wall. The captain then commanded, "[h]it her." Krasnoperov did not follow this command because he "couldn't hit somebody for no reason at all," so the commander ordered one of the other men to take the girls to the car.

The girls' father offered the captain money, presumably for the release of the girls, but the captain took the money without releasing the girls. He also directed Krasnoperov to turn over his weapon to the sergeant. The soldiers and the girls then got into the military car.

About a kilometer from the village, the car pulled over into a wooded area, and the sergeant ordered one of the soldiers to get the girls out. As Krasnoperov remained in the car, the rest of the soldiers and the officers "started raping the girls." After a while, Krasnoperov was invited "to join the orgy." He refused and was commanded to join and threatened that he would pay for his insubordination. Next, several of the soldiers dragged Krasnoperov out of the car, beat him with their feet, put handcuffs on him, and left him in the car. After about five to ten minutes, "everybody was back in the car."

The official report of the incident said that Krasnoperov had been beaten by the villagers. However, Krasnoperov himself filed an accurate report with the commander of the military academy. He was examined at the hospital and returned to his unit where he was told that he was being sent to Leningrad pending further investigation. Ultimately Krasnoperov was expelled from the military academy and sent to do his service in another area.

Krasnoperov also admitted that he had been present during incidents in which his compatriots stole things from persons they stopped at roadside checkpoints. But he denied having ever participated in any of these thefts.

In her post-hearing decision, IJ Holmes-Simmons found that both respondents were not credible witnesses. As to Krasnoperov, she explained "that the respondent's version of events do[es] not match what is in his I-589 [asylum application]."

The IJ next turned to the bar to asylum and withholding of removal imposed on those

4

who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C § 1158(b)(2)(A)(I) (asylum); see also 8 U.S.C. §1231(b)(3)(B)(i) (withholding). She found that Krasnoperov "[c]learly . . . is a persecutor" because, in part, she did not credit his denial of participation in the rapes. Even if Krasnoperov had not participated in the rapes, the IJ found him to be a persecutor based on actions that he admitted.

The IJ also found that Krasnoperov had not met his burden of proof because he failed to submit certain documents and other documents were not authenticated and/or not in conformance with Russian records. Judge Holmes-Simmons also found the evidence insufficient to support Balachova's claim and noted that changes had occurred in Russia in the thirteen years since both petitioners left. Finally, she denied the petitioners' CAT claims because they "failed to establish that it's more likely than not they'd be subject to torture if returned to their native country."

Both petitioners appealed to the BIA, which summarily affirmed the results of the IJ's opinion.

## DISCUSSION

### I. Standard of Review

Because the BIA summarily affirmed the IJ's decision, see 8 C.F.R. § 1003.1(e)(4), we review the IJ's decision as the final agency determination. E.g., Twum v. INS, 411 F.3d 54, 58 (2d Cir. 2005). We review the agency's factual findings, including adverse credibility determinations, under the substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). However, an adverse credibility determination must be based on "specific, cogent

5

reasons" that "bear a legitimate nexus to the finding." Secaida-Rosales v. INS, 331 F.3d 297, 307 (2d Cir. 2003) (internal quotation marks omitted).[2] A determination "based on flawed reasoning . . . will not satisfy the substantial evidence standard," and the agency's use of "an inappropriately stringent standard when evaluating an applicant's testimony constitutes legal, not factual error." Id. We will vacate and remand for new findings if the agency's reasoning or its fact-finding process was sufficiently flawed. Cao He Lin v. U.S. Dep't of Justice, 428 F.3d 391, 406 (2d Cir. 2005); Tian-Yong Chen v. INS, 359 F.3d 121, 129 (2d Cir. 2004). However, where despite evident errors, we can confidently predict that the agency would adhere to the same result absent error, we need not remand. Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 339 (2d Cir. 2006). Finally, de novo review is required for questions of law and the application of law to undisputed fact. E.g., Secaida-Rosales, 331 F.3d at 307.

## II. Balachova

The IJ found that Balachova was not credible. This finding was dispositive of all her claims; yet, Balachova did not point out any errors in the IJ's adverse credibility finding on her appeal to the BIA. Although issue exhaustion is not jurisdictional, it is mandatory. Lin Zhong v. U.S. Dep't of Justice, 480 F.3d 104, 121-24 (2d Cir. 2007). Thus, we grant the government's request to dismiss Balachova's claims for failure to exhaust administrative remedies.

## III. Krasnoperov

### A. Credibility

---

[2] Although we recently held that the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231 (2005), abrogated significant portions of Secaida-Rosales for asylum petitions filed after May 11, 2005, see Xiu Xia Lin v. Mukasey, 534 F.3d 162, 167 (2d Cir. 2008), petitioners' applications were filed long before the effective date of the REAL ID Act. In addition, the proposition for which we have cited Secaida-Rosales is not affected by Xiu Xia Lin.

6

The basis of the IJ's adverse credibility finding for Krasnoperov is very unclear. The only specific factor she cited with reference to credibility was a variance between Krasnoperov's asylum application and his testimony. While Judge Holmes-Simmons did not identify the inconsistency in her credibility analysis, she had earlier stated that Krasnoperov testified that he had never filed a false report, but that his asylum statement indicated that he had been asked to rob villagers and then file false reports.

The IJ also may have believed that two other portions of Krasnoperov's testimony undermined his credibility. She found that he had initially testified that there was no synagogue in Russia but later testified that he attended a synagogue in Leningrad. In addition, within the corroboration section of her analysis, the IJ stated that Krasnoperov testified that he was not really in the army, but that a work record book showed that he served in the military inspector of personnel department. However, the IJ did not indicate that either of the purported discrepancies played any role in her credibility—as opposed to her burden of proof—analysis. As a result of the IJ's imprecision, we are unable to determine with confidence the basis for the IJ's adverse credibility finding.[3]

_____

[3] The government argues that we should dismiss Krasnoperov's claim that the adverse credibility determination was not supported by substantial evidence because he did not attack the IJ's credibility findings in his brief to the BIA. However, Krasnoperov did argue that if the IJ had "taken time and read the materials submitted by the respondent, and really listened to the respondent's testimony, then it would be clear that this respondent was very credible." We have held that an individual who raises a general argument may be able to raise specific subsidiary legal arguments or arguments by extension. See Gill v. INS, 420 F.3d 82, 86-87 (2d Cir. 2005). Moreover, the specificity with which a petitioner must raise arguments before the BIA correlates with the specificity of the IJ's findings. Given the failure of the IJ to indicate which specific portions of Krasnoperov's testimony caused her to find that testimony incredible and the generally disorganized nature of her decision, we hold that Krasnoperov sufficiently exhausted his attack on the IJ's credibility analysis.

Because we are unsure of the basis for the adverse credibility finding, we cannot sustain it and will remand to allow the agency to specify the bases on which it relied. Cf. Song Jin Wu v. INS, 436 F.3d 157, 164 (2d Cir. 2006) ("It is not the function of a reviewing court in an immigration case to scour the record to find reasons why a[n agency] decision should be affirmed. Rather, we take the [agency's] decision as we find it, and if the reasoning it advances for denying a petitioner's claim cannot support the result, we will vacate the decision.").[4]

Nevertheless, because certain possible bases for the IJ's finding were clearly mistaken, we will address those bases in the interest of judicial economy. First, Krasnoperov's initial testimony concerning the lack of synagogues was not inconsistent with his later testimony that he attended a synagogue in Leningrad. The early testimony related to the "the place where [he] was born," which was not Leningrad. Second, contrary to the IJ's statement, there was no inconsistency between Krasnoperov's testimony that he never filed a false report and his application. In the statement attached to his application, Krasnoperov said that officers filed false reports and that they directed the filing of false reports, but he did not say that he ever filed a false report. Third, Krasnoperov did not testify, as the IJ found, that he was never in the army.

*B. Burden of Proof*

The IJ found that Krasnoperov did not satisfy his burden of proving that he suffered religious persecution because he did not submit medical records from the United States concerning a leg fracture he allegedly incurred in one of the anti-Semitic attacks; his abstract of injuries incurred in another attack was not authenticated; his birth certificate was not

---

[4] For the same reason, we do not consider credibility arguments raised by respondent that were not identified as bases for the IJ's adverse credibility finding.

8

authenticated and did not conform to originals on file; and he did not supply letters from the synagogues he allegedly attended in Russia and the United States. The agency may not deny an otherwise credible asylum application solely for lack of corroboration if it has not "explain[ed] specifically, either in its decision or otherwise in the record: (1) why it is reasonable under the BIA's standards to expect such corroboration; and (2) why [the applicant's] proffered explanations for the lack of such corroboration are insufficient." Diallo v. INS, 232 F.3d 279, 290 (2d Cir. 2000).[5]

Krasnoperov testified to two beatings by anti-Semites. First, in May 1991, he was walking home from the synagogue wearing a yarmulke on his head. Five people severely beat him and he went to the hospital with a broken leg. Krasnoperov furnished no medical corroboration of the leg injury. He explained that he requested a certificate of his treatment and was told by the hospital that it did not issue certificates "for casts." When asked why he did not obtain x-rays from an American hospital, Krasnoperov answered: "I never had such a request to do that. If I had one, I would absolutely have done it to make the record clear."

In August of the same year while on the way to a movie theater, Krasnoperov came upon a rally at which attendees displayed posters saying "Kikes, get out of Russia." Because one of Krasnoperov's former classmates recognized him as a Jew, he was again beaten and acid was poured on him. Krasnoperov submitted a medical extract stating that he was admitted to the

_____

[5] In addition, we have strongly suggested that the IJ offer an applicant the opportunity to remedy any evidentiary deficiencies before denying a claim solely based on lack of corroboration unless the need for corroboration is self-evident. In Ming Shi Xue v. BIA, 439 F.3d 111, 122 (2d Cir. 2006), we said in dictum, "it is improper for an IJ to deny asylum on insufficient corroboration grounds without first giving the applicant an opportunity to submit what may be readily available evidence."

hospital on August 20, 1991, and discharged on September 16, 1991. The diagnosis was "[c]hemical burn 1st degree on 22% of left side area, II degree cerebral concussion, bruises, hematomas."

> About Krasnoperov's allegation that his leg had been broken, the IJ said:
>
> [C]learly, if his leg was broken, the respondent could've went [sic] to a doctor in the United States, had that leg x-rayed, and it would still be revealed that it was broken. He did not do so and his only explanation for why not is simply because he didn't think of it.

She also apparently relied on Krasnoperov's failure to authenticate the Russian record of his chemical burns and concussion.

While the IJ did identify the x-ray of the leg as medical corroboration that was missing but reasonably available, and found Krasnoperov's explanation for not offering it implausible, she did not make comparable findings on the record with respect to other forms of corroboration that she stated were lacking. In contravention of our precedent, neither the IJ nor the INS counsel asked Krasnoperov why he did not obtain an authenticated copy of the medical abstract documenting his chemical burns and concussion. See Diallo, 232 F.3d at 290. Further, it is not at all clear that fourteen years after the fact, a Russian hospital would issue an authenticated copy of a medical record. Cf. Cao He Lin, 428 F.3d at 405 (cautioning, in a different context, that the agency should not speculate without record support as to practices in another country). Thus, the IJ erred in relying on Krasnoperov's failure to authenticate the abstract.

The IJ also noted that, according to a consular investigation, Krasnoperov's birth certificate did not conform to Russian records, and that the copy furnished was not authenticated. The consular report on which the IJ relied states that

10

On June 28, 1999 INS Moscow filed a diplomatic note # 099-044 with the Russian Ministry of Foreign affairs asking them to verify the information in the birth certificate, submitted by the respondent, with the appropriate Russian authorities (in this case, the Civil Registry Office of the city of Tyumen). On November 15, 1999 INS Moscow received a response from the Russian Ministry of Foreign Affairs. According to the diplomatic note # K-568-99/1543, the information in the birth certificate submitted by the respondent does not comply with the official record certifying his birth.

No further information concerning the investigation is given. We have held that a report similarly lacking in detail was "highly unreliable and therefore insufficient to satisfy the substantial evidence requirement." Zhen Nan Lin v. U.S. Dep't of Justice, 459 F.3d 255, 269 (2d Cir. 2006).[6] In support of its holding, the Zhen Nan Lin court noted that the Department of Justice had issued guidelines for use in connection with consular investigative reports. Id. at 270-71 (citing Memorandum from Bo Cooper, INS General Counsel, to Jeffrey Weiss, INS Director of Int'l Affairs, Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information 6 (June 21, 2001)). Those guidelines mandate that the report contain, "at a minimum," the name and title of the investigator, an indication of the investigator's fluency in the relevant language, an explanation of the competency of the investigator and/or translator, the specific objective of the investigation, the places where conversations or searches were conducted, the names and titles of people spoken to in the course of the investigation, the method used to verify the information, the circumstances, content, and results of each relevant conversation or search, and a statement that the investigator is aware of INS confidentiality provisions. Id. at 271.

_____

[6] The government argues that we may not consider any argument based on Zhen Nan Lin because Krasnoperov did not raise this argument in his brief to the BIA. Krasnoperov did, however, challenge the IJ's conclusion that the legitimacy of his birth certificate was questionable because it did not conform to "official record keeping." We view the challenge to the reliability of the consular report as subsidiary to this general argument and thus reach it. See Gill, 420 F.3d at 86.

As in Zhen Nan Lin, the report in this case contains no information concerning the qualifications of the investigators, the identity of the Russian officials who prepared the response to the consular inquiry, or the methods, if any, used to verify the information supplied by the foreign official. See id. at 271-72. Further, it is not even clear in what respects the birth certificate Krasnoperov offered varied from the original. We do not know whether there are major inconsistencies between the town's birth records and the certificate Krasnoperov furnished or merely minor technical inconsistencies. Under these circumstances, the consular report is unreliable and cannot contribute to a finding of substantial evidence. See id. at 269.[7]

In addition, it was not permissible for the IJ to rely on Krasnoperov's failure to authenticate his birth certificate without considering his explanation that it would be difficult to obtain an authenticated certificate because you have to apply in person and he no longer had relatives in Russia. See Cao He Lin, 428 F.3d at 404.

The IJ committed the same error—failure to consider the adequacy of Krasnoperov's explanation—in connection with his failure to obtain letters from his synagogues. As to his United States synagogue, Krasnoperov testified that he only attended on major holy days and no-one in his synagogue knew him personally. Krasnoperov also testified that he had not attended his Leningrad synagogue since 1991. He added, "and send them a request, I don't know. I just never . . ." and was then cut off by another question from the IJ. Thus, the IJ failed to consider

_____

[7] The government argues that Zhen Nan Lin is distinguishable because the document in that case was an arrest report that was directly relevant to showing persecution, and thus the Chinese government had a motive to discredit it. This argument is not persuasive because the Zhen Nan Lin court squarely held that "the Consular Report [was] insufficiently detailed to permit a reviewing court to assess its reliability." Id. at 270. Thus, even if the foreign official lacks a motive to fabricate, an insufficiently detailed consular report does not constitute substantial evidence because its reliability cannot be verified.

12

Krasnoperov's explanation in both instances and, in the second instance, may have prevented him from offering a full explanation. In light of these errors, we cannot sustain the IJ's finding that Krasnoperov failed to satisfy his burden of proof, and we must remand to the agency to allow it to address the deficiencies we have identified.

### C. Persecutor Bar

In order to qualify for asylum, an applicant must be a "refugee," 8 U.S.C. § 1158(b), and the statutory definition of "refugee" excludes "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42). Withholding of removal is available to an applicant who establishes that his or her "life or freedom would be threatened in [the proposed country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," unless as relevant here, "the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3).

Accordingly, there are several elements that must exist before the persecutor bar is established. First, the alien must have been involved in acts of persecution. We have strongly suggested that the BIA should apply the same definition to persecution in the persecutor-bar context as it does in defining who is a refugee. See Chao Qun Jiang v. BCIS,. 520 F.3d 132, 135 (2d Cir. 2008) ("[W]e urge the BIA to apply consistently the standard for what conduct constitutes 'persecution' for purposes of establishing refugee status, and for purposes of determining whether an individual who 'ordered, incited, assisted, or otherwise participated in' that conduct would be subject to the persecutor bar.") (citation omitted)).

13

Second, withholding and asylum statutes require that the persecution that bars relief occurred "because of," 8 U.S.C. § 1231(b)(3), or "on account of," 8 U.S.C. § 1101(a)(42), the victim's protected status. Therefore, a nexus must be shown between the persecution and the victim's race, religion, nationality, membership in a particular social group, or political opinion.

Third, the alien's conduct, if he or she did not incite, order, or actively carry out the persecutory acts, must have "assisted" the persecution. See Xu Sheng Gao v. U.S. Att'y Gen, 500 F.3d 93, 99 (2d Cir. 2007) (internal quotation marks omitted). "Where the conduct was active and has direct consequences for the victims, we have concluded that it was 'assistance in persecution.' Where the conduct was tangential to the acts of oppression and passive in nature, however, we declined to hold that it amounted to such assistance." Id. (quoting Zhang Jian Xie v. INS, 434 F.3d 136, 142-43 (2d Cir. 2006)). In defining "assistance," we are guided by Fedorenko v. United States, 449 U.S. 490 (1981), in which the Supreme Court addressed parallel language in the Displaced Persons Act of 1948. See Xu Sheng Gao, 500 F.3d at 99; Zhang Jian Xie, 434 F.3d at 140-42. In an oft-cited footnote, Fedorenko says:

> The solution to the problem [of barring Jewish prisoners in a German concentration camp from relief because they technically assisted in persecution by, for instance, leading arriving prisoners to the gas chambers] lies not in "interpreting" the act to include a voluntariness requirement that the statute itself does not impose, but in focusing on whether particular conduct can be considered assisting in the *persecution* of civilians. Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

Id. at 512 n.34 (citation omitted)

14

Finally, notwithstanding the fact that the persecutor bar does not include a voluntariness requirement, the alien must have sufficient knowledge that his or her actions may assist in persecution to make those actions culpable. See Xu Sheng Gao, 500 F.3d at 102 ("[O]n this record, we are . . . unable to conclude that [petitioner] had the requisite level of knowledge that his acts assisted in persecution to sustain a finding that he was a 'persecutor' under the statute."); Castañeda-Castillo v. Gonzales, 488 F.3d 17, 22 (1st Cir. 2007) (holding that the persecutor bar "*presumptively* . . . should be read not to apply to petitioner" if his testimony that he knew nothing of plans for a massacre that his actions objectively assisted were accepted).

IJ Holmes-Simmons found that Krasnoperov was subject to the persecutor bar because she did not believe that he did not participate in the rape of the two young girls. Alternatively, she found that he was a persecutor even if his testimony were credited because "he and his partners kicked down the door of this Armenian family"; he reached out to grab the girls and they pulled away from him; he rode with the other military officials when they took the girls into the woods; and he sat in the car during the rape and did nothing to protest the other soldiers' actions. The IJ explained that when "[t]his respondent reached out for the girls, attempted to put them in the vehicle, [he] knew very well that them being placed in the vehicle was for no good means other than to do something illegal against them." She also found that "[his] inaction furthered [the] persecution."

In addition to her general adverse credibility finding, the IJ identified one additional reason for not believing that Krasnoperov did not participate in the rape: when he realized he was implicating himself in the rape, "[h]e tried in some frail way to convince this Court that the rape he was talking about is not the same kind of rape described in the English language." Krasnoperov's semantic efforts are relevant because his asylum statement can be read to say that

15

the soldiers "started raping" the girls as soon as they got to the wooded area, while in portions of his testimony, he indicated that the soldiers had only started undressing the girls when they invited him to join the orgy. Regardless of these differences, however, Krasnoperov consistently testified that he was in the car when the abuse of the girls began and was beaten and handcuffed when he refused to participate. Therefore, the IJ's conclusion that Krasnoperov must have participated in the abuse of the girls because he equivocated on the meaning of "rape" is not supported by substantial evidence.

We must also vacate the IJ's determination that the actions that Krasnoperov admitted assisted in persecution. As a preliminary matter, the IJ made no nexus finding; that is, she did not find that the family was targeted because they were Armenian as opposed to being targets of convenience. The closest the IJ came to such a finding was saying:

> Clearly, these people were Armenian and it has been reported in the historical records that at the time the Russian soldiers were supposed to be guarding this Armenian area, they were pillaging and plundering and raping individuals and stealing from them.

These comments about the historical record are not cited to any source and are made in the context of determining that Krasnoperov's inaction furthered the persecution rather than in the context of nexus. More important, the IJ never found that the Armenian family was persecuted because it was Armenian.

These errors alone would require vacatur and remand. However, the IJ committed other errors. To identify them, we will look separately at (1) the IJ's finding that Krasnoperov's participation in the search of the family's house and in the detention of the two girls and his presence when items were robbed from cars assisted in persecution, and (2) the finding that Krasnoperov's inaction and preliminary actions contributed to the rapes of the two girls.

16

The IJ appears to have confused illegality with persecution in finding that breaking in the door, searching the house, looting, and detention were persecution. While these acts may well not have been legal under Russian law, we find no precedent establishing that they are persecution. Indeed the law, insofar as it exists, is to the contrary. We have held that very brief detentions are not persecution, Ai Feng Yuan v. U.S. Dep't of Justice, 416 F.3d 192, 198 (2d Cir. 2005), and the BIA has held that looting is not persecution, In re A-M, 23 I & N Dec. 737, 740 (B.I.A. 2005). Although we found no cases discussing house searches, we do not believe that such searches—even if performed without justification—would cross the line from harassment to persecution. See Ivanishvilli v. U.S. Dep't of Justice, 433 F.3d 332, 341 (2d Cir. 2006) (holding that "mere harassment" does not constitute persecution and defining "harassment as 'words, conduct or action (usu[ally] repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose'") (quoting Black's Law Dictionary 721 (7th ed. 1999)).

We are left to consider the rape of the two girls. We have no doubt that rape is sufficiently serious to constitute persecution. But Krasnoperov's actions in connection with the rape were few. He did not assist in breaking down the door, and while he participated in the search and in detaining the family within the house, we have already held that these actions were not persecution. Although Krasnoperov briefly attempted to get the girls in the car, he stopped when they drew away from him and refused to hit them. Even assuming arguendo that the IJ's finding that Krasnoperov knew at the time the girls were placed in the car that they would be abused is supported by substantial evidence, we still cannot agree that his sole act of reaching out for the girls but stopping when they drew away is sufficient to constitute assistance in the subsequent rape. Krasnoperov's act of reaching out for the girls was tangential to the oppression

17

and had no direct consequences for the victims.  See Xu Sheng Gao, 500 F.3d at 99.

The IJ also found that Krasnoperov's inaction assisted in the rapes.  If Krasnoperov's testimony is credited, he was relieved of his gun before the molestation of the girls began and he was handcuffed and on the floor of the car when they were actually raped.  When he refused to participate in the rape, he was beaten.  Thus, it is hard to see how he could have acted to prevent the rapes.  Moreover, we have located no precedent indicating that failing to prevent persecution can constitute persecution.  Because the BIA's decision affirmed only the results of the IJ's decision, we cannot discern whether it agreed that Krasnoperov's inaction "assisted" in the persecution.  If, on remand, the BIA takes the position that failure to intervene constitutes assistance, it should fully explain its holding.

*D. Convention against Torture*

In his brief to the BIA, Krasnoperov did not quarrel with the IJ's finding that he failed to show it was more likely than not that he would be tortured if returned to Russia.  Therefore we dismiss this claim as unexhausted.  See 8 U.S.C. § 1252(d)(1).

**CONCLUSION**

For the reasons we have discussed, we dismiss Balachova's direct claims and Krasnoperov's  CAT claim and otherwise grant review, vacate the BIA's order of removal, and remand for further proceedings in conformity with this decision.  Our dismissal of Balachova's direct claims is not intended to prejudice any derivative claim she may have on Krasnoperov's application.

18