06-4791-ag
Weng v. Holder

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: October 29, 2008                                    Decided: April 14, 2009)

Docket No. 06-4791-ag

_____

YANQIN WENG,

*Petitioner*,

— v .—

ERIC H. HOLDER JR.,*

*Respondent*.

_____

Before:

WALKER, B.D. PARKER, and RAGGI,

*Circuit Judges*.

_____

Petition for review of an order of the Board of Immigration Appeals dismissing an application for asylum, withholding of removal, and protection under the Convention Against Torture. Petition GRANTED in part and DENIED in part, and REMANDED for further proceedings.

_____

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), we have substituted current United States Attorney General Eric H. Holder Jr. for former United States Attorney General Alberto Gonzales as the respondent in this case.

YANQIN WENG, *pro se*, New York, N.Y.

JANICE K. REDFERN, Attorney, Office of Immigration Litigation (PETER D. KEISLER, Assistant Attorney General, and JAMES E. GRIMES, Senior Litigation Counsel, *on the brief*), Civil Division, U.S. Department of Justice, Washington, D.C., *for Respondent*.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Petitioner Yanqin Weng ("Weng"), a citizen of the People's Republic of China, seeks review of an order of the Board of Immigration Appeals ("BIA") dismissing her appeal from the decision of the Immigration Judge ("IJ") denying her application for asylum and withholding of removal and her application for protection under the Convention Against Torture ("CAT"). *See* 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. § 208.16(c). The IJ denied relief because she concluded that Weng, who worked as a nurse's assistant at a public hospital that performed forcible abortions pursuant to China's family planning policy, was a "persecutor" and, consequently, was statutorily ineligible for asylum or withholding of removal. The IJ also found that Weng was not entitled to relief on her CAT claim because she had not established that, more likely than not, she would be tortured if removed to China. The BIA adopted and affirmed the IJ's decision and dismissed Weng's appeal, finding that Weng had engaged in conduct that was "active and had direct consequences for victims of persecution."

Because we hold that the BIA's conclusion that Weng was subject to the persecutor bar was incorrect, we grant Weng's petition with respect to her asylum and withholding of removal claims. We deny the petition insofar as it challenges the BIA's denial of CAT relief.

**BACKGROUND**

The record below indicates that starting in February 2004, Weng worked as a nurse's assistant at Langqi Township Hospital ("Langqi"), a public hospital in Fujian Province, China. Her responsibilities included such tasks as registering patients, assisting nurses in caring for patients, recording vital signs, and maintaining patients' files.

Because of a serious traffic accident on a nearby highway on August 19, 2004, the hospital's doctors were occupied. That evening, five pregnant women who had been detained were brought to Langqi to undergo abortions, but were forced to wait in Weng's duty room for a considerable period for an available doctor. A family planning official supervised the women during their wait and Weng was assigned to assist him.

Later that night, one of the detained women confided in Weng that, although this was the woman's first pregnancy, she nevertheless had been targeted by the government because her husband, a widower, had a son from his previous marriage. Government officials had arrested her at her mother's house, where she had been hiding, and had brought her to Langqi. The woman sought Weng's assistance in escaping, and, according to Weng's testimony, Weng agreed to help the woman knowing that such assistance would jeopardize her position at the hospital. After helping the woman exit the hospital via a rear staircase, Weng returned to her duty room and attempted to evade the official's questions about the missing woman's location. The official, dissatisfied with Weng's responses, physically abused her. Later that morning, Weng was fired.

Soon after this incident, several local government officials appeared at Weng's house and demanded that she reveal the location of the missing pregnant woman, threatening Weng with arrest if she refused to supply the information. Fearful, Weng allegedly fled to the home of a

relative in a nearby city. On several occasions during the ensuing weeks, the officials returned to Weng's home, searching for her. In September 2004, Weng left China and eventually entered this country without documentation. She believes that the family planning authorities are still searching for her and seek to arrest her.

In February 2005, Weng applied for political asylum, withholding of removal, and CAT protection. The IJ denied Weng all relief. First, the IJ found that Weng was not credible because her story about the woman she ostensibly freed contradicted country condition reports and Chinese family planning regulations. Second, the IJ found that Weng's provision of post-surgical care to women who had undergone abortions, paired with her assistance to a family planning official in guarding patients on August 19, 2004, demonstrated that Weng "played a role critical to the effect of enforcement of the coercive population control policy in China." Having found that Weng was a "persecutor," the IJ concluded that she was barred from asylum and withholding of removal. The IJ further found Weng ineligible for CAT protection because she had not shown that, more likely than not, she would be tortured if returned to China. Weng appealed and the BIA dismissed the appeal. Adopting and affirming the IJ's decision (except with respect to the adverse credibility finding), the BIA found that Weng was subject to the persecutor bar and, as a result, was ineligible for asylum or withholding of removal. Adverting to our decision in *Zhang Jian Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006), the BIA characterized Weng's conduct as "active and [as having] direct consequences for the victims" of China's family planning policy. The BIA also affirmed the IJ's denial of Weng's application for CAT relief. This appeal followed.

**DISCUSSION**

Because the BIA adopted and affirmed the IJ's decision, we review the two decisions in tandem. *Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005). The "substantial evidence" standard of review applies, *Islam v. Gonzales*, 469 F.3d 53, 55 (2d Cir. 2006), and we uphold the IJ's factual findings if they are supported by "reasonable, substantial and probative evidence in the record," *Lin Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 116 (2d Cir. 2007) (internal quotation marks omitted).

By contrast, "[w]e review *de novo* questions of law and the [BIA's] application of law to undisputed fact." *Bah v. Mukasey*, 529 F.3d 99, 110 (2d Cir. 2008). We therefore review *de novo* the BIA's conclusion that Weng is subject to the persecutor bar of the Immigration and Nationality Act ("INA").

To be eligible for asylum, an applicant must establish her status as a "refugee" under the INA. 8 U.S.C. § 1158(b)(1)(B). The applicant may do so by demonstrating either that she has suffered "persecution" or that she has "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42). The statutory definition of "refugee," however, incorporates the "persecutor bar": the definition excludes "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground. *Id*.; *see also* 8 U.S.C. § 1158(b)(2)(A)(i). Consequently, if Weng is a persecutor, she is ineligible for "refugee" status.

Withholding of removal, unlike asylum, is a mandatory form of relief reserved for aliens whose "life or freedom would be threatened in [their] country [of removal] because of [their]

5

race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The persecutor bar applies to this form of relief as well, however, in that withholding of removal is not available to an alien who "ordered, incited, assisted, or otherwise participated in the persecution of an individual" on the basis of a protected ground. *Id.* § 1231(b)(3)(B)(i).

In *Balachova v. Mukasey*, 547 F.3d 374, 384 (2d Cir. 2008), we identified four factors underpinning the persecutor bar. "First, the alien must have been involved in acts of persecution," as the term is defined in the INA's definition of "refugee." *Id.* We construe this requirement to mean that the individual in question ordered, incited, or actively carried out the persecution. Second, a "nexus must be shown between the persecution and the victim's race, religion, nationality, membership in a particular social group, or political opinion." *Id.* Third, if the alien did not incite, order, or actively carry out the persecution, her conduct must have "'assisted'" the persecution. *Id.*; *see also Fedorenko v. United States*, 449 U.S. 490, 512 n.34 (1981) (identifying a type of conduct that amounts to assistance in persecution and distinguishing it from conduct that does not). Finally, the applicant must have had "sufficient knowledge that . . . her actions [might] assist in persecution [in order] to make those actions culpable." *Balachova*, 547 F.3d at 385.

Neither party disputes that forced abortion satisfies the second prong of the *Balachova* test, and the record does not establish that Weng's conduct amounts to active involvement under the first prong. We are not required to reach the fourth prong because we conclude that the third—proof of "assistance in persecution"—has not been satisfied.

In determining whether Weng's conduct amounts to "assistance" in persecution we look to her behavior as a whole. *Xie,* 434 F.3d at 142-43. As we noted in *Xie*, "assistance in

6

persecution" is conduct that is "active and ha[s] direct consequences for the victims."  *Id.* at 143.

By contrast, conduct that is "tangential to the acts of oppression and passive in nature" does not

amount to assistance in persecution.  *Id.*

The relevant decisions routinely have found abhorrent conduct to rise to the level of

assistance in persecution, *see id.*; *United States v. Reimer*, 356 F.3d 456, 461 (2d Cir. 2004);[1]

*Maikovskis v. INS*, 773 F.2d 435, 446 (2d Cir. 1985), but have offered scant guidance on how to

classify less overtly culpable conduct.  For example, in *Fedorenko*, the Supreme Court easily

distinguished between the conduct of a concentration camp barber who did not assist persecution

and that of armed guards who did, but recognized that "[o]ther cases may present more difficult

line-drawing problems . . . ."  *Fedorenko*, 449 U.S. at 512 n.34.

The BIA concluded that Weng assisted persecution by providing post-surgical care to

victims of forced abortions and by guarding such victims on one occasion.  Weng testified that

her post-surgical care consisted essentially of checking vital signs, maintaining charts, and taking

temperatures following the performance of the abortions by others.  The BIA cast this care as

"conduct [that] was active and [that] had direct consequences for victims of persecution."  As a

---

[1] *Fedorenko* and *Reimer* dealt with the analogous persecutor bar of the Displaced Persons Act of 1948 ("DPA"). Unlike the INA, the DPA saddles the government with the burden of proving that an immigrant assisted in persecution in order to revoke his citizenship.  *See Reimer*, 356 F.3d at 459 n.4.  We are also mindful that the DPA has a different structure and purpose than the INA. *See Negusie v. Holder*, 129 S. Ct. 1159, 1167 (2009).  Despite these differences between the statutes, we find instructive—but do not consider ourselves bound by—*Fedorenko*'s and its progeny's interpretations of the DPA's persecutor bar.  *See Balachova*, 547 F.3d at 384 ("In defining 'assistance,' we are *guided* by *Fedorenko* . . . , in which the Supreme Court addressed parallel language in the Displaced Persons Act of 1948.") (emphasis added).  Because we conclude that Weng's conduct did not rise to the level of conduct triggering the persecutor bar, we have no cause to consider, in light of *Negusie*, the extent to which *Fedorenko* is instructive on the relevance of a putative persecutor's culpability.  *See Negusie*, 129 S. Ct. at 1165 (holding that *Fedorenko*'s negation of voluntariness with respect to the DPA's persecutor bar does not command the same result with respect to the analogous INA provision).

matter of law, we disagree. The prohibited behavior was the forced abortion. Weng's post-surgical care did not contribute to, or facilitate, the victims' forced abortions in any "direct" or "active" way. Her conduct neither caused the abortions, nor made it easier or more likely that they would occur. These actions were, at most, "tangential," "passive accommodation" of the conduct of others, and thus they do not trigger the persecutor bar. *See United States v. Sprogis*, 763 F.2d 115, 122 (2d Cir. 1985) (holding that the DPA's analogous persecutor bar did not apply to petitioner's conduct).

Weng's activities on the evening of August 19 are somewhat more troublesome. According to the IJ and the BIA, her "active assistance" involved sitting outside the locked door of her regular shift room, in which the patients were required to wait for their forced abortions. Approximately ten minutes after the patients arrived, Weng accompanied one of them to the bathroom and helped her escape.

To be sure, guarding patients awaiting forced abortions comes closer to active assistance than does post-operative monitoring of vital signs. But when we examine Weng's behavior "as a whole," we nonetheless conclude that the evidence did not support a finding that the line had been crossed. Weng's conduct that evening deviated markedly from her routine duties at Langqi. This occasion was the first and only one on which she guarded patients, and, apparently, such guarding of patients did not routinely occur at the hospital. We further note that she was unarmed, that she performed actual guard duties for only approximately ten minutes before accompanying one of the patients to the restroom, that she helped one of the patients to escape, and that she lost her job as a result. Given these factors, we conclude that Weng's conduct, considered in its entirety, was tangential, and not sufficiently direct, active, or integral to the administering of forced abortions as to amount to assistance in persecution.

This result is consistent with our precedent. In *Xu Sheng Gao v. United States Attorney General*, 500 F.3d 93, 101-03 (2d Cir. 2007), we held that the persecutor bar did not apply to a supervising officer of a local Chinese government agency whose bureau inspected bookstores for materials banned by China's cultural laws. We noted that "the only 'activity' Gao performed that could have allegedly assisted in persecution was to issue a report to his supervisor when he or his inspectors encountered a 'serious' violation of the cultural laws." *Id.* at 101. Even on occasions when Gao issued such a report, we reasoned, "[n]umerous steps had to occur before an arrest could potentially occur, and . . . Gao . . . [had no] input, knowledge, or control in such decisions." *Id.* We concluded that this conduct was not sufficiently active or direct to trigger the persecutor bar, *id.* at 102, and we reach the same result with respect to Weng's conduct.

In *Xie*, we affirmed the BIA's application of the bar to a petitioner who played a more substantial role in persecution than did Weng. 434 F.3d at 144. Xie's duties as a van driver for a local Chinese department of health included occasionally transporting pregnant women against their will to hospitals where officials would perform forced abortions on them. *Id.* at 138. Xie testified that he performed this role on approximately three to five occasions, on each of which the woman being transported "physically resisted and wept," and that on the final occasion—the only time he was not accompanied by a guard—he released the woman he was transporting. *Id.* Our decision attributing Xie with assistance in persecution turned on the fact that, in driving the van, he played "an active and direct, if arguably minor, role" in enforcing the family planning policy. *Id.* at 143. Specifically, Xie "ensured that [the women] were delivered to the place of their persecution: the hospitals where their forced abortions took place." *Id.* Weng, by contrast, did not engage in conduct necessary to Langqi's commission of forced abortions.

For these reasons, we grant Weng's petition with respect to the BIA's denial of her applications for asylum and withholding of removal, and remand for the BIA to determine, in the first instance, if Weng is eligible for such relief.

Finally, we conclude that the agency's findings underlying its determination that Weng does not qualify for CAT relief were supported by substantial evidence. Her testimony regarding her anticipation of torture upon removal essentially was that she believed Chinese officials were looking for her, and that she will be singled out for harsh punishment amounting to torture, such as fines, detention, hard labor and/or imprisonment if she is removed to China. Because she acknowledged, however, that she had no evidence to support these assertions, we see no reason to disturb the BIA's conclusion that she was ineligible for CAT relief.

**CONCLUSION**

For the foregoing reasons, Weng's petition for review is (1) GRANTED as to the BIA's denial of her applications for asylum and withholding of removal, and (2) DENIED as to the BIA's decision that she is ineligible for CAT relief. The case is REMANDED to the BIA for further proceedings consistent with this opinion.