THOMAS, Chief Judge,
dissenting:
I would join the Second Circuit in resolving the issue before us. Unsworn, unauthenticated, hearsay letters — prepared for litigation by the government and not subject to any form of cross-examination— cannot form the sole basis for denying asylum to an otherwise qualified applicant. Therefore, I must respectfully dissent.
I
A
Five of our sister circuits have held that the government may not deny asylum solely on the basis of conclusory letters prepared for litigation in reliance on multiple layers of unauthenticated hearsay, without affording the petitioner some right of confronting the charges. Four of those circuits reached this result on constitutional grounds, holding that the admission of unauthenticated consular letters against an asylum applicant violates that applicant’s procedural due process rights. Banat v. Holder, 557 F.3d 886, 892-93 (8th Cir.2009); Anim v. Mukasey, 535 F.3d 243, 256-58 (4th Cir.2008); Alexandrov v. Gonzales, 442 F.3d 395, 407 (6th Cir.2006); Ezeagwuna v. Ashcroft, 325 F.3d 396, 405-08 (3d Cir.2003). The Second Circuit declined to reach the constitutional issue but held that such letters, standing alone, could not provide a basis for denying asylum under the substantial evidence standard because they lacked sufficient indicia of reliability and trustworthiness. Lin v. U.S. Dep’t of Justice, 459 F.3d 255, 268-72 (2d Cir.2006); see also Balachova v. Mukasey, 547 F.3d 374, 382-83 (2d Cir.2008) (applying Lin). Although I would resolve the present case purely on statutory grounds, as the Second Circuit did, the cases decided by our other sister circuits also provide useful guidance here.
In Banat, for instance, the Eighth Circuit rejected an IJ’s reliance on a consular letter that cited an unidentified investigator from the U.S. embassy in Beirut because the letter contained “multiple levels of hearsay” and omitted any mention of the investigator’s qualifications, experience, or “contact.” 557 F.3d at 891-92. The court acknowledged that “overseas investigations by State Department officials concerning the authenticity of documents purportedly originating in foreign countries are often necessary for the adjudication of an asylum claim,” id. at 890; however, it concluded that “the IJ’s reliance on the State Department letter, which provided no details about the investigation that would allow the IJ to assess the investigation’s reliability or trustworthiness and which contained multiple levels of hearsay, violated Banat’s right to a fundamentally fair hearing.” Id. at 893. The court reasoned:
*912 Reliance on reports of investigations that do not provide sufficient information about how the investigation was conducted are fundamentally unfair because, without that information, it is nearly impossible for the immigration court to assess the report’s probative value and the asylum applicant is not allowed a meaningful opportunity to rebut the investigation’s allegations.
Id. at 891.
The Fourth Circuit relied on similar logic in Anim when it rejected a State Department letter authored by the same official involved in our case. The court noted that the official’s letter was “comprised entirely of multiple hearsay statements.” 535 F.3d at 257. It also pointed out that “letter does not explain how Bunton received the information she relates, nor does the letter disclose the identities of some of the individuals involved in the chain of communication.” Id.; see also id. (“Without the details of the investigation, it is impossible for an immigration judge, the BIA, or a court to evaluate the reliability of the letter’s conclusions.” (citations omitted)). Based on these deficiencies, the Anim court concluded that “the Bunton letter contains insufficient indicia of reliability and, as a result, its use was fundamentally unfair.” Id. at 256.
The courts in both Anim and Banal relied heavily on the Second Circuit’s reasoning in Lin, 459 F.3d at 268-72. In Lin, the Second Circuit rejected a consular report almost identical to the letter at issue here. The consular report was based on the opinions of Chinese government officials who, as the Lin court noted, “appear to have powerful incentives to be less than candid on the subject of their government’s persecution of political dissidents.” Id. at 269-70. The court also observed that the report lacked other traditional markers of reliability, namely: “(i) the identity and qualifications of the investigators); (ii) the objective and extent of the investigation; and (iii) the methods used to verify the information discovered.” Id. at 271. The Lin court distilled these factors from the Department of Justice’s own guidelines for evaluating the reliability of documents produced overseas.[1] Noting that the consular letter failed to satisfy these basic criteria, the court held that the report was “insufficiently detailed to permit a reviewing court to assess its reliability” and, as such, could not support a finding that the petitioner had forged documents submitted with his asylum application. Id. at 270.
Critically, the Second Circuit reached this conclusion as a statutory matter, hold *913 ing that the consular report was “highly unreliable and therefore insufficient to satisfy the substantial evidence requirement.” Id. at 269. The court noted that the Third and Sixth Circuits had recently rejected similar reports as procedural due process violations[2] but, ultimately, the Lin court held that it was unnecessary to reach the constitutional issue. Id. (“Although we find the logic of these cases [concerning procedural due process] persuasive, we do not reach the constitutional issue presented because the statutory standard of review requires vacatur.” (emphasis in original)). The court later took the same approach in Balachova. 547 F.3d at 383 (concluding that a consular report that “contain[ed] no information concerning the qualifications of the investigators, the identity of the Russian officials who prepared the response to the consular inquiry, or the methods, if any, used to verify the information supplied by the foreign official” was “unreliable and cannot contribute to a finding of substantial evidence”).
Our case cannot be distinguished from Lin or Balachova. The IJ relied on a short, unsworn letter from a State Department official to support his finding that Angov forged parts of his asylum application. The letter was devoid of any information concerning the methodology employed in the investigation or the qualifications of the investigators. Instead, it was based on the unauthenticated, hearsay statements of an unidentified Bulgarian police official who worked at the police station where Angov claims to have been severely beaten. Like the government officials in Lin, that police official — whose department had been accused of ethnically motivated brutality — had a strong ineen-tive to be “less than candid.” 459 F.3d at 269.
In sum, the Bunton Letter was comprised of conclusory statements of fact, none of which were supported by the basic information required under Lin and Balachova. We are left, as was the Second Circuit, with a document that is “insufficiently detailed to permit a reviewing court to assess its reliability.” Lin, 459 F.3d at 270. Indeed, in many ways, there is less information in the Bunton Letter than in the letters rejected as unreliable by our sister circuits. Accordingly, because the Bunton Letter lacks the indicia of reliability set forth in Lin, the agency could not have relied on it under the substantial evidence standard.
B
Neither Lin nor Balachova discussed the specific procedural protections guaranteed to aliens in removal proceedings under 8 U.S.C. § 1229a(b)(4)(B). That provision, however, offers independent grounds for barring the government from relying on unsworn, unauthenticated hearsay letters as the sole basis for denying an alien relief from removal.
Section 1229a(b)(4)(B) expressly provides that every alien “shall have a reasonable opportunity to examine the evidence against [him or her], to present evidence on [his or her] own behalf, and to cross-examine witnesses presented by the Government” during removal proceedings. See also 8 C.F.R. § 1240.10(a)(4) (requiring the IJ to “[a]dvise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in *914 his or her own behalf and to cross-examine witnesses presented by the government”). We have recognized the “importance of the right to confront evidence and cross-examine witnesses” under this statute.[3] Cinapian v. Holder, 567 F.3d 1067, 1074 (9th Cir.2009) (listing “several cases” highlighting the importance of this right). As we explained in those cases, the “purpose of this statutory guarantee cannot be fulfilled ... if the government’s choice whether to produce a witness or to use a hearsay statement is wholly unfettered.” Baliza v. INS, 709 F.2d 1231, 1234 (9th Cir.1983). ' Rather, to comply with this provision, the government must “make a reasonable effort to present the witness” for cross-examination. Cinapian, 567 F.3d at 1074.
The majority asserts that the “government here did make a reasonable effort to obtain a witness” for cross-examination but, ultimately, was stymied by the State Department’s policy of not releasing follow-up information about overseas investigations. See supra, Op. at p. 899. This “effort” cannot be sufficient to satisfy the government’s burden under the statute. Indeed, allowing one executive branch agency to rely on another executive branch agency’s blanket policy of refusing to provide certain information is tantamount to granting the government the kind of unfettered discretion we repudiated in Baliza. As for the policy itself, whatever logistical obstacles might have once justified the State Department’s blanket refusal to produce overseas government witnesses for removal proceedings, those obstacles can surely be overcome in an age of video conferencing.[4] Indeed, federal law specifically allows IJs to conduct entire hearings via telephone or video conference. 8 U.S.C. § 1229a(b)(2)(A); see also 8 C.F.R. § 1003.25(c) (“An Immigration Judge may conduct hearings through video conference to the same extent as he or she' may conduct hearings in person.”).
Because the government did not make a reasonable effort to produce Bunton for cross-examination, I would hold that its reliance on the Bunton Letter violated An-gov’s rights under § 1229a(b)(4)(B).[5]
C
The government argues that the Bunton Letter should be credited as trustworthy *915 by employing the presumption of regularity — that is, that government officials accurately perform their reporting duties without bias. See Espinoza v. INS, 45 F.3d 308, 310 (9th Cir.1995) (holding that “information on an authenticated immigration form is presumed to be reliable in the absence of evidence to the contrary presented by the alien”).
However, the presumption of regularity does not apply when the source of information “was neither a government official nor the subject of the report.” Hernandez-Guadarrama v. Ashcroft, 394 F.3d 674, 681 n. 9 (9th Cir.2005) (citing Espinoza, 45 F.3d at 310). The key hearsay statement in the Bunton Letter comes from a Bulgarian police employee, not a U.S. government official or Angov. Statements made by third persons under no business duty to report are not entitled to the presumption of reliability and cannot be considered subject to the presumption, even if included in a document that enjoys such a presumption. United States v. Pazsint, 703 F.2d 420, 424-25 (9th Cir.1983); see also Pouhova v. Holder, 726 F.3d 1007, 1014-15 (7th Cir.2013) (rejecting application of presumption of reliability to hearsay statements of third parties recorded in official documents); Jordan v. Binns, 712 F.3d 1123, 1133 (7th Cir.2013) (“[T]he presumption of reliability that serves as the premise for the public-records exception does not attach to third parties who themselves have no public duty to report.”).
Second, the presumption of reliability, similar to the traditional hearsay exception for public records, applies to documents “prepared in accordance with normal recordkeeping requirements.” Espinoza, 45 F.3d at 310; see also Lopez-Chavez v. INS, 259 F.3d 1176, 1181 (9th Cir.2001) (“It must be shown that the document has been certified by the INS District Director as a true an[d] accurate reflection of INS records.”). The Bunton Letter, summarizing the results of an investigation involving multiple individuals and carried out at the behest of a party involved in litigation, is not comparable to an authenticated immigration form routinely filled out by border agents. Espinoza, 45 F.3d at 309. It is not a “business record” which is prepared in the usual and ordinary course of business. It was not authenticated or certified. It did not even conform with the agency’s own reporting procedures, as described and set forth in the Cooper Memo. Thus, the ad hoc Bunton Letter does not qualify as a government document produced in accordance with regular agency procedure.
For these reasons, I find the government’s arguments unpersuasive.
II
Adjudicating asylum claims is necessarily an imperfect endeavor. Witnesses to alleged foreign persecution are rarely available; documents are often impossible to locate. The immigration judge is often left with assessing witness credibility as the only means of resolving the request for relief. We are often limited to seeing through a glass, darkly.
As to post-KEAL ID Act asylum seekers, the IJ may require corroboration, even when presented with credible testimony. See Aden v. Holder, 589 F.3d 1040, 1044 (9th Cir.2009) (‘Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.” (quoting 8 U.S.C. § 1158(b)(1)(B)(ii))). We have sustained the BIA’s denial of relief founded on the inability of an asylum seeker to obtain corroboration. Shrestha v. Holder, 590 F.3d 1034, 1047-48 (9th Cir.2010).
*916 In the post-REAL ID Act world, when corroborating evidence has assumed more importance, it is not unfair or unduly burdensome to require the government to identify basic, rudimentary information about its sources when it challenges corroborating evidence so that the IJ can properly weigh it. The information our sister circuits have demanded is modest. They do not require that every detail be uncovered or every riddle solved, they merely ask that very basic foundational questions — already in the hands of the Executive Branch — be answered. The Executive Branch invests significant resources in forensic document analysts, who provide detailed declarations in immigration cases. It is not much to ask that in the case of routine foreign fact-checking, the government simply tell us how it acquired the facts upon which it asks us to deny asylum.
The alternative is a decision founded solely on anonymous hearsay, often — as in this case — produced by the very foreign government actors the asylum-seeker accuses of persecution. We should be wary of relying on “secret informers, whisperers and talebearers” to decide legal rights in this context, especially when their word is used as the sole basis to deny relief to an otherwise qualified applicant. See Parker v. Lester, 227 F.2d 708, 719 (9th Cir.1955) (cautioning against relying on untrustworthy sources in awarding security clearances to Coast Guard employees). The immigration system is fraught with enough risk of error. When it is reasonably possible, we need to minimize that risk.
I respectfully dissent.

. The Justice Department’s guidelines stated that, in the case of a fraudulent document, the "report must contain, at a minimum: (i) the name and title of the investigator; (ii) a statement that the investigator is fluent in' the relevant language(s) or that he or she used a translator who is fluent in the relevant language(s); (iii) any other statements of the competency of the investigator and the translator deemed appropriate under the circumstances (such as education, years of experience in the field, familiarity with the geographic terrain, etc.); (iv) the specific objective of the investigation; (v) the location(s) of any conversations or other searches conducted; (vi) the name(s) and titled) of the people spoken to in the course of the investigation; (vii) the method used to verify the information; (viii) the circumstances, content, and results of each relevant conversation or search! ]; and (ix) a statement that the Service investigator is aware of the confidentiality provisions found in 8 C.F.R. § 208.6.” Memorandum from Bo Cooper (“Cooper Memo”), Gen. Counsel, Immigration & Naturalization Serv., to Jeffrey Weiss, Dir., Immigration & Naturalization Serv. Office of Int’l Affairs, Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information (June 21, 2001), available at http://judiciary.house.gov/legacy/82238.pdf at 39-45.

. See Alexandrov, 442 F.3d at 407 (holding that memoranda prepared by a U.S. embassy official in Sofia did "not meet our standards of trustworthiness and reliability and were therefore improperly relied upon by the immigration court”); Ezeagwuna, 325 F.3d at 406-08 (holding that a letter prepared by a U.S. embassy official in Yaounde contained "multiple hearsay of the most troubling kind” and, therefore, was "neither reliable nor trustworthy”).

. The majority suggests that, because foreign officials are not themselves "amenable to cross-examination,” allowing State Department officials to be cross-examined when they "inescapably rely” on information from foreign officials would not significantly enhance the credibility of that information. Op. at p. 899. This view overlooks the fact that State Department officials would be less likely to accept unreliable information as true if they knew that they might later be subject to cross-examination. Furthermore, if State Department officials did rely on information obtained from foreign officials, they would be prepared to explain why that information was trustworthy.

. At the very least, the State Department should be required to produce some specific hardship or reason why it cannot produce the witness for cross-examination, rather than relying on a general policy.

.The four of our sister circuits to resolve this issue on constitutional grounds did not discuss the procedural rights guaranteed under § 1229a(b)(4)(B). However, the reasoning they used in concluding (unanimously) that the admission of unauthenticated, hearsay letters during removal proceedings violates an alien’s procedural due process rights counsels toward holding that such letters also violate the alien's statutory rights under § 1229a(b)(4)(B). We have recognized that the due process right is closely related to the statutory right in this context. See Bondarenko v. Holder, 733 F.3d 899, 907 (9th Cir.2013) ("The due process right, incorporated into 8 U.S.C. § 1229a(b)(4)(B), includes, among other things, 'a reasonable opportunity to examine the evidence against the alien.’ ” (emphasis added; citations omitted)).